## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-CA-00947-SCT

*RHONDA CHIPLEY BURNS*

*v.*

*BOYD T. BURNS*

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-A**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/04/95 |
| TRIAL JUDGE: | HON. EDWARD G. CORTRIGHT JR. |
| COURT FROM WHICH APPEALED: | LEAKE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | J. LANCE BUTLER |
| | JERRY K. BALDWIN |
| | TERRI DONNA REGAN |
| ATTORNEYS FOR APPELLEE: | PAULA STENNETT-YANCY |
| | LAWRENCE PRIMEAUX |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 5/15/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/5/97 |

**BEFORE SULLIVAN, P.J., PITTMAN AND BANKS, JJ.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

### I.

Boyd Burns filed for divorce from Rhonda Burns on April 21, 1994, in Leake County Chancery Court. Boyd's complaint alleged habitual cruel and inhuman treatment and adultery. Boyd sought exclusive custody and control of their minor children and child support. Rhonda filed a counterclaim seeking a divorce on grounds of habitual cruel and inhuman treatment. Rhonda sought exclusive custody and control of their minor children and child support. On July 11, 1994, a hearing for temporary relief was held. Among other relief, the court awarded Boyd temporary custody of the three children and temporary exclusive use and possession of the marital domicile. Rhonda was awarded visitation rights.

The trial was held on April 18, 1995, May 22, 1995, May 24, 1995, and June 7 1995, in the Eleventh Chancery Court District before Chancellor Cortright. A judgement was rendered on July 5, 1995, in which the Chancellor awarded Boyd custody and Rhonda visitation rights.

On July, 26, 1995, Rhonda filed a motion for reconsideration which the Chancellor denied on August 1. On August 14, 1995, Rhonda filed a motion for reconsideration of prior order. Rhonda's motion was denied on August 16, 1995. On September 12, 1995, Rhonda appealed to this Court.

On October 3, 1995, an emergency hearing was held to rule upon Rhonda's modification of custody motion. Chancellor Cortright denied the motion and reaffirmed Boyd's custody.

## II.

Rhonda Chipley Burns and Boyd Burns married on July 27, 1985 in Leake County. Their marriage produced three children: Corey Burns born November 3, 1986; Casey Burns, born January 22, 1988; and Caleb Burns, born June 9, 1991. The couple lived in their marital home in Leake County from August, 1991, until their separation in January, 1994. The marital home is located approximately eight miles from Boyd's parent's house. Boyd filed for divorce on April 21, 1994, alleging adultery.

Rhonda had an adulterous relationship with Jimmy Dale Ferguson in 1994 while still married to Boyd. This adulterous relationship led to the birth of Joshua Tyler. Joshua was conceived in July, 1994. Rhonda realized she was pregnant in August, 1994. Joshua Tyler was born on March 1, 1995. Rhonda acknowledges that Boyd is not the father. Rhonda and Ferguson do not have definite plans as to whether they will marry. In order to pay for the birth expenses, Rhonda applied for Medicaid. Since the time of the birth, Ferguson visits Rhonda and Joshua Tyler two to three times a week. Ferguson has not established any type of relationship with the three Burns children and has not been around them.

During the course of the marriage, Boyd worked for Rowan Drilling. Boyd's work schedule involved working fourteen days at sea on an off-shore oil rig and then fourteen days at home. Rhonda was a housewife and the primary caretaker of the children.

After the separation, Rhonda remained at the marital home. From the time of the separation until July 11, 1994, Rhonda and Boyd shared custody of the children. During the separation, while home from work at Rowan drilling, Boyd stayed with his parents. The fourteen days home from work, Boyd had custody of the children. The fourteen days while off shore, Rhonda had custody of the children.

On July 11, 1994, a temporary hearing was held. Among other things, the temporary order awarded Boyd temporary exclusive custody of the children and temporary and exclusive custody of the marital home.

After the temporary hearing, Rhonda left the marital home and moved in with her mother. Rhonda moved to Kosciusko in November, 1994. Rhonda rents a four bedroom home in Kosciusko. Rhonda began school before the separation. Rhonda received her LPN from East Central Community College after the separation. Rhonda worked as a nurse for a home-bound man in the late stages of Hodgkin's disease in Kosciusko from August to early December, 1994. Rhonda then worked at the Montfort Jones Hospital in Kosciusko for roughly two weeks until she had her baby. At the time of trial,

Rhonda's parents helped pay Rhonda's bills. Rhonda has not worked since December of 1994 and was unemployed at the time of trial but planned to seek employment at the end of the summer, 1995, as a nurse. At the time of trial, Rhonda was receiving food stamps, monetary help from her parents, and monetary help from Ferguson. Since the temporary hearing in 1994, Rhonda has not paid Boyd any money for child support.

Rhonda testified that while she kept the children, she often left them in the care of relatives. Rhonda testified that she left her children with Boyd's mother while visiting Ferguson. Rhonda testified that an adulterous relationship would not be a good role model for the children. Rhonda testified that she never filed assault charges or had Boyd arrested for abuse.

Rhonda testified that Boyd rarely helped with the children when he was home from the oil rigs. Rhonda testified that Boyd never fixed breakfast for the children. Rhonda admitted that Boyd helped bathe the children and sometimes fixed the children's lunches.

Corey and Casey attend Pleasant Grove Academy in Leake County. They enrolled in this school while the couple was still married. Rhonda stated reservations about Pleasant Grove Academy because it has not been accredited. However, the children attended it while the parties were married and Rhonda did not object. The children study academic subjects. The school teaches from a Christian perspective. The school curriculum is the Accelerated Christian Education and has been approved by the State of Mississippi. The school started in 1993 and was only two years old at the time of trial. A passing grade is an 85 instead of the public school 70. The school is sponsored by Congregational Methodist, but is not a denominational school. The school does offer standardized achievement tests such as the California Achievement test.

Boyd worked for Rowan Companies, incorporated. Boyd terminated employment in July, 1994, in order to spend his time at home with the children. As previously stated, Boyd's work schedule at Rowan consisted of working fourteen days at sea, and then spending fourteen days at home. While working for Rowan, Boyd also cut and baled hay and raised cattle. After the separation, Rhonda sold the cattle. After terminating employment with Rowan, Boyd eventually began chicken farming. Boyd received a SBE loan to raise chickens. Boyd received his first batch of chickens in March 1995.

From the temporary order in July, 1994, until February, 1995, Boyd lived in the marital home with the children. Occasionally, Boyd and the boys stayed at Boyd's parent's house. Once the chicken houses were complete and the first batch of chickens arrived, Boyd and the children stayed at Boyd's parents' house on a regular basis. For a few weeks, Boyd and the children stayed almost every night at his parents' house. They did this because Boyd's parents' house is close to the chicken houses. In fact, the chicken houses are on his father's land. However, Boyd is in the process of obtaining title to the land. When the chickens are young, they require much more supervision. Often in the night, Boyd must go check on the chickens. Since he would not leave the children by themselves, Boyd and the boys stayed at his parents' house. Once the chickens matured, Boyd and the boys stayed at the marital home two to three nights a week. If granted custody, Boyd testified that he wanted to sell the marital house and move closer to the chicken houses. A mobile home is located near the chicken houses on the eighty acres. Until there is money to build, Boyd wants to live in the mobile home. The mobile home has three bedrooms. Boyd testified that the chicken houses are not a health risk. Chicken houses are located in much of this area of Mississippi.

Boyd testified that he helps the children with their school work and bathes them even while staying at his parents' house. Boyd sees that the children are properly dressed for school. At his parents' house, Boyd slept with the children in the same bedroom. The bedroom has a double bed and a bunk bed with a double on the bottom. However, Boyd's parents' house has other bedrooms not in use.

Boyd's mother, Mrs. Burns, testified that Boyd is responsible for getting the boys dressed and that they have had their meals while staying at her house. Mrs. Burns testified that her husband and her mother also live in her house. At the Boyd's parents' house, the children ride horses and three wheelers. There are always children at Mrs. Burns' house. Mrs. Burns' house is located on 180 acres.

Boyd testified that during their marriage, the children regularly went to his parent's house. They have always lived very near Boyd's parents.

Near the separation, Rhonda began school for her LPN. During this time, Rhonda often left the children in the care of Boyd's parents. Boyd also helped take care of the children while Rhonda was in school. Boyd testified that he woke the children up, fixed their lunches and did housework.

Boyd testified that the children are in good health and no longer under medical treatment for chronic conditions such as asthma. Since the separation, Boyd has paid the house note as well as the couple's other expenses, such as the credit card debts.

Boyd testified that he does keep loaded guns in the house. The guns were in the house when Boyd and Rhonda lived together as well. The children are not allowed to touch or play with the guns.

Both parties had an expert witness testify at trial. Dr. Wood Hiatt testified on Boyd's behalf. Dr. Hiatt testified that Corey and Casey were very perplexed that Rhonda was pregnant by someone other than Boyd. He testified that Corey and Casey stated that they wanted to maintain living with their father and visiting their mother. Dr. Hiatt testified that Boyd was a fit father and a good custodian. Dr. Hiatt testified that he applied the *Albright* factors in determining that Boyd was a fit and proper parent. Dr. Hiatt concluded that the children's relationship with their paternal grandparents, such as living at their house on a frequent to regular basis, is very positive.

Dr. Jesse Dees testified on Rhonda's behalf. Dr. Dees testified that Casey and Caleb preferred to stay with their mother. Corey did not give a preference. Dr. Dees testified that Rhonda was a capable mother. Dr. Dees testified that it was important for the children to have consistency and not be shuttled around between houses as Boyd had been doing.

On August 4, 1995, a judgement was rendered. The Chancellor awarded Boyd custody of the children with liberal visitation. The Chancellor did not order Rhonda to pay child support since she was presently unemployed. However, the Chancellor did not preclude Mr. Burns from seeking a modification for child support once Rhonda began employment.

On October 3, 1995, an emergency hearing was held before Chancellor Cortright on Rhonda's motion for modification of custody. In her motion, Rhonda alleged that Boyd abused Casey. The Chancellor determined that Boyd had not abused Casey and denied Rhonda's motion.

**III.**

## WHETHER THE CHANCELLOR PROPERLY EVALUATED THE *ALBRIGHT* FACTORS WHEN AWARDING CUSTODY?

The standard of review in child custody cases is that this Court is bound to the findings of the Chancellor if the findings are not manifestly wrong or substantially erroneous. *Sellers v. Sellers*, 638 So.2d 481, 483 (Miss. 1994); *Crow v. Crow*, 622 So.2d 1226, 1227 (Miss. 1993); *Bell v. Parker*, 563 So.2d 594, 596-97 (Miss. 1990).

Rhonda contends that the Chancellor improperly applied the *Albright* factors and did not consider *Moak v. Moak*, 631 So.2d 196 (Miss. 1994). Rhonda contends that the Chancellor used Rhonda's adulterous relationship as a sanction in awarding Boyd custody. Citing *Moak*, Rhonda contends that adultery does not preclude an award of child custody. Rhonda further contends that the Chancellor failed to consider marital fault on Boyd's part. Rhonda is correct in stating that the best interests of the children is the polestar consideration of the Courts. *Moak*, 631 So.2d at 198 (Miss. 1994). In *Albright v. Albright*, 437 So.2d 1003 (Miss. 1983), we set out a number of factors in evaluating the best interests of the children in child custody cases. The *Albright* factors include:

1) Health and sex of the child;

2) Determination of the parent that has had the continuity of care prior to the separation;

3) Which has the best parenting skills;

4) Which has the willingness and capacity to provide primary child care;

5) The employment of the parent and the responsibilities of that employment;

6) Physical and mental health and age of the parents;

7) Emotional ties of the parent and the child;

8) Moral fitness of the parents;

9) The home, school and community record of the child;

10) The preference of the child at the age sufficient to express a preference by law;

11) Stability of home environment and employment of each parent;

12) Other factors relevant to the parent-child relationship.

*Albright*, 437 So.2d at 1005. The Chancellor's findings as to each of the factors are discussed in turn below.

*Health and sex of the child*. Noting past sufferings of asthma, the Chancellor concluded that the children were in good health and have had no difficulty with asthma in months. All three children are male.

*Parent that has had the continuity of care prior to the separation*. The Chancellor noted that Rhonda was the primary care-taker until the temporary hearing held in July 1994. Since July, 1994, Boyd has

been the primary care-taker. The Chancellor further noted that Boyd made substantial contributions toward caring for the children when home from the oil rig while employed at Rowan. The Chancellor also noted that Rhonda has not contributed to the support of the children since the temporary hearing and that Boyd has been almost totally responsible.

*Parenting skills.* The Chancellor found that both parties had equal parenting skills.

*Willingness and capacity to provide primary child care.* The Chancellor noted that each parent seemed willing to provide the primary care for the children. However, the Chancellor found that Boyd had a greater capacity. The Chancellor noted that Boyd owns his own chicken farm which places his location of work near the home which will allow plenty of opportunity to spend time with the children during the day. Also, the chicken farm is located near Boyd's parent's house which would allow additional supervision when Boyd needs to be with the chickens. The Chancellor noted that Rhonda would be taking on a significant amount of responsibility with a new born baby, new employment, and possibly a new husband with whom the children are not familiar. The Chancellor concluded that the father should have custody and that the paternal grandparents, whom the children are familiar, would be near.

*Employment of the parents and the responsibilities of that employment.* The Chancellor noted that Boyd is a chicken farmer and will be able to spend time during the day with the children. At trial, Rhonda was unemployed. However, Rhonda testified that she hoped to begin work at the end of the summer as a nurse.

*Physical and mental health and age of the parents.* The Chancellor noted that Rhonda is 28 years old and Boyd is 33. The Chancellor concluded that both parties are in good health.

*Emotional ties of the parent and child.* While the Chancellor did not specifically address this topic, the record reveals that all parties concerned, parent and child alike, have strong emotional attachment. Therefore, no party has a greater claim to this factor.

*Moral fitness of the parent.* The Chancellor found that Boyd was the more morally fit of the two. The Chancellor found, and Rhonda admitted, that Rhonda has participated in an adulterous relationship.

*Home, school, and community record of the child.* The Chancellor noted that due to their age, the children have little community and school record. The Chancellor found that though the school that Corey and Casey are now attending is not presently accredited, the school emphasizes a good tailored curriculum for each child. The Chancellor noted that even though Rhonda did have reservations about Pleasant Grove Academy, the children attended the school with out her objection prior to the separation.

*Preference of the child.* The children are not at the age sufficient to declare a preference. However, the chancellor noted the testimony of both expert witnesses.

*Stability of home environment and employment of each parent.* At trial, Rhonda harped on Boyd's moving the children back and forth between the marital house and Boyd's parent's house. Rhonda contends that this constitutes a very unstable home environment. However, the Chancellor concluded

that the evidence failed to indicate that the movement between the houses had an adverse affect on the children. Also, as previously mentioned, Boyd's employment as a chicken farmer keeps him close to the house. When Boyd is unable to oversee the children, they can be looked after by their paternal grandparents whom they are very familiar. Rhonda was unemployed at the time of trial but was seeking employment to start at the conclusion of the summer. Rhonda potentially will have a new job with no relatives near to help look after the children.

The Chancellor noted that both parties attempted to paint the other party in unfavorable light. Rhonda contends that Boyd is too permissive by allowing the children to wander about unsupervised, riding horses and three wheelers with out helmets, playing at the chicken houses, and riding the tractor. The Chancellor stated:

> Perhaps some of the things that Mr. Burns allows the children to do is more adventuresome than some parents are inclined to permit. However, it must be remembered that these children were reared in the country and such children customarily engage in activities more adventuresome than those of their city cousins.

The Chancellor also remarked that most of these same activities complained of were allowed without Rhonda's objection prior to the separation.

After reviewing the record, we cannot conclude that the Chancellor was manifestly wrong or substantially erred.

## IV.

### WHETHER THE CHANCELLOR ABUSED HIS DISCRETION BY NOT ALLOWING SIBLINGS TO REMAIN TOGETHER IN CUSTODY?

Rhonda contends that the three children from her marriage with Boyd now have a half-brother, Joshua, son of Rhonda and Ferguson. Rhonda contends that the Court policy is not to separate siblings. Therefore, Rhonda contends that all the brothers should be together.

Absent a showing of absolute necessity of the child's welfare, we have never expressed a hard and fast rule concerning the separation of siblings in child custody cases. *Sparkman v. Sparkman,* 441 So.2d 1361, 1362 (Miss. 1983). *Sparkman* stated that a common sense recognition of the ordinary facts of life dictated that separation of siblings is not in the best interest of the children unless there are some unusual and compelling circumstances. *Sparkman*, 441 So.2d at 1363. *Sparkman* based its conclusion on policy reasons found in *Mixon v. Bullard*:

> The court should in all cases attempt, insofar as possible, to keep the children together in a family unit. It is well recognized that the love and affection of a brother and sister at the ages of these children is important in the lives of both of them and to deprive them of the association ordinarily would not be in their best interest.

*Mixon v. Bullard*, 217 So.2d 28, 30-1 (Miss. 1968). In *Mixon*, both children were the result of the same marriage. In *Sparkman*, the children were the product of the divorcing parties' marriage. We do not and will not make a per se rule that half siblings do not enjoy the same presumption of not being separated from their siblings as full-blooded siblings enjoy. However, the facts of this case do

not create a presumption that separating Corey, Casey, and Caleb from Joshua is not in the children's best interests. The court did not separate the Burns children from Joshua because they were never together. Joshua never lived with the Burns children as a family unit. On the contrary, Joshua was born on March 1, 1995, a month before the trial. The Burns children have been living with Boyd since the temporary order in July of 1994. Furthermore, an adulterous relationship can constitute a compelling and unusual circumstance as in the case *sub judice*. When we spoke of the common recognition of the ordinary facts of life, we had not envisioned an adulterous relationship producing a baby for which the custody of the children of the marriage must necessarily be determined.

In conclusion, Rhonda's argument fails to consider that the new baby is hers and Ferguson's and not hers and Boyd's. Understandably children, even half brothers and sisters, should be kept together after spending a considerable amount of time together and creating a special bond that brothers and sisters develop. However, in the case *sub judice*, Boyd was granted temporary custody in July 1994. Boyd has had custody since that time. Rhonda and Ferguson's child Joshua, the half brother of the other three, was born in July 1995. In other words, the half-brother was born a year after Boyd was awarded custody. We would be hard pressed to conclude that the three brothers have developed the type of bond with Joshua that mandates keeping siblings together when the three have never even lived with Joshua. Therefore, we can not conclude that the Chancellor erred.

## V.

### WHETHER THE CHANCELLOR COMMITTED REVERSIBLE ERROR BY NOT ALLOWING RHONDA TO PRESENT WITNESSES AT TRIAL THAT DID NOT APPEAR IN ANSWERS IN THE DISCOVERY INTERROGATORIES?

Rhonda contends that the Chancellor committed reversible error by not allowing Rhonda to present some of her witnesses and their testimony at trial. Rhonda contends that her witnesses which were precluded from trial would have testified as to Boyd's moral fitness. These witnesses include Jane Brown, Jackie Burns, Robin Cain, and Tom Dial. Since moral fitness is an important *Albright* factor, Rhonda contends that the Chancellor should have heard and considered the evidence. Since a chancellor must determine what is in the best interests of the children in a child custody proceeding, "chancellors should consider any and all evidence which aids them in reaching the ultimate custody decision." *Murphy v. Murphy*, 631 So.2d 812, 814 (Miss. 1994). Rhonda contends that Boyd had an opportunity to take depositions of some of the witnesses and did in fact take depositions of some of the witnesses precluded from testifying.

While Rhonda is correct in asserting that the Chancellor should consider all evidence so as to determine the best interests of the children, the facts of the case *sub judice* do not reveal reversible error. The court record is replete with motions to compel Rhonda to cooperate in the discovery process. On November 16, 1994, counsel for Boyd filed a motion to compel discovery since thirty days had passed since the change in Rhonda's counsel. The Chancellor granted the motion and ordered Rhonda's counsel to file and serve her responses to discovery on or before December 22, 1994. On December 28, 1994, Boyd's counsel filed a motion for sanctions since Rhonda had not complied with the court's order to respond to discovery by the twenty-second. On January 12, 1995, Boyd's counsel filed a motion to take the request for admissions as admitted since they were not denied within the thirty days prescribed by MRCP 36(a). On January 17, 1995, the Chancellor set the

date for trial as April 18, 1995, and continued Boyd's counsel's request for sanctions. Also on January 17, 1995, counsel for Rhonda filed answers to Boyd's interrogatories. On February 3, 1995, Boyd filed a motion to compel responsive answers to the interrogatories claiming the answers were inadequate. On March 10, 1995, Rhonda filed a second supplemental response to Boyd's interrogatories. On the same day, Rhonda declined to answer Boyd's request for admissions claiming they were untimely filed. On February 16, 1995, the Chancellor ordered Rhonda to filed responsive answers to interrogatories before February 28, 1995. On March 14, 1995, Boyd filed a motion to compel response to admissions. On March 28, 1995, the Chancellor ordered Rhonda to respond to Boyd's request for admissions before April 7, 1995. On April 4, 1995, Rhonda filed supplemental answers to the witness list. This supplemental answer contained the name of Liz Tollison but not any of the other contended potential witnesses. Furthermore, Ms. Tollison's name was merely listed with a telephone number. On April 7, 1995, Boyd filed a motion for protective order and other relief noting that the Chancellor directed that all supplemental answers to discovery be filed not later than twenty-one days prior to the date set for trial, April 18, 1995. On April 5, 1995, thirteen days before trial, Rhonda filed supplemental answers and issued depositions of Jackie Burns and Jana Brown to be held on April 12, 1995, six days before trial.

On April 25, 1995, counsel for Boyd filed a notice of deposition to take the deposition of Robin Cain on May 4, 1995. This was later moved to May 17, 1995. On the first day of trial, April 18, 1995, the Chancellor denied Boyd's motion for a protective order. The Chancellor stated that since the trial would continue at a later date, Boyd would not be prejudiced by allowing Jackie Burns and Jana Brown to be witnesses. Furthermore, the Chancellor allowed Rhonda to amend her list of witnesses to include Tom Dial and Robin Cain. The Chancellor ordered discovery for thirty days.

At trial on May 24, 1995, the Chancellor determined that Jana Brown was able to testify even though her name was not in the answers to interrogatory 25. The Chancellor upheld Boyd's objection that neither Rhonda nor her witnesses could testify as to any instances in 1993 that pertain to Rhonda's counter-claim for divorce which were not listed in interrogatory 25. The Chancellor stated that he would allow instances in 1993 relating to child custody.

Rhonda contends that the Chancellor erred by not allowing her to testify that Boyd hit her in 1993.

Liz Tollison testified at trial. Boyd objected to a particular instance to which Ms. Tollison was about to testify. The Chancellor sustained Boyd's objection since the instance was not listed in interrogatory 25. Ms. Tollison's testimony concerning the particular instance was proffered into the record. Ms. Tollison would have testified that while Rhonda was pregnant at church with Boyd, Boyd told Ms. Tollison, "Since my old lady is pregnant again, I guess you will have to take her place in the bedroom."

The Chancellor sustained Boyd's objection to Robin Cain, Rhonda's sister, testifying. The Chancellor noted that Ms. Cain was not listed on the interrogatories. Rhonda attempted to add Ms. Cain's name to the list of amended interrogatories by handing a piece of paper with Cain's name hand written on it to counsel for Boyd while taking a deposition of another witness. Boyd did take Ms. Cain's deposition but without any information as to what she would testify. Ms. Cain's testimony was proffered. Ms. Cain would have testified that Boyd made two sexual advances on her, one explicitly lewd which contained physical contact.

The Chancellor also sustained Boyd's objection to Jana Brown testifying. The circumstances involving the preclusion of Ms. Brown's testimony are the same as Ms. Cain. Ms. Brown's testimony was proffered. Ms. Brown, as an adverse witness to Rhonda, would have testified that she is married, has two children, and has visited Boyd's parents' house, as well as Boyd's house.

It is evident from the record that counsel for Rhonda time and again failed to follow the proper discovery procedures found in MRCP. It is not the duty of counsel to try opposing counsel's case for them. However, even if we had determined that the Chancellor committed error by not allowing certain testimony, the error was clearly harmless. Boyd denied all proffered accusations. As the Chancellor pointed out in his opinion, each party has attempted to paint the other party in unfavorable light. None of the testimony proves that Boyd was an unfit parent. Furthermore, even though Rhonda has attempted to introduce the testimony as a moral fitness issue, even if taken true, these instances do not rise to the level of adultery. None of the proffered testimony is of the level to reverse this case.

## VI.

### WHETHER THE CHANCELLOR COMMITTED REVERSIBLE ERROR IN GRANTING BOYD'S OBJECTION TO PRECLUDE THE TRANSCRIPT OF AN EMERGENCY HEARING FROM THE COURT RECORDS?

An emergency hearing was held on October 3, 1995, before Chancellor Cortright. The hearing involved a motion filed by Rhonda for modification of child custody on grounds that Boyd physically abused Casey. The Chancellor denied Rhonda's motion.

The court reporter included the transcript of the emergency hearing as part of the record for Rhonda's appeal to this Court. However, Boyd filed an objection to the inclusion of the emergency hearing transcript with the rest of the court proceedings. The Chancellor sustained Boyd's objection and ordered the transcript of the motion to modify hearing stricken from the record. On May 19, 1996, Justice Roberts, for this Court, ruled that Boyd's motion and objection to content of the record pursuant to M.R.A.P. 10(b)(5), 10(e), and 10(f) was moot given that the lower court did strike the record. Therefore, this Court dismissed Boyd's motion since what he requested had already been granted by the lower court. This Court also reinstated the briefing schedule. Rhonda contends that the lower court ruling granting Boyd's objection to the record is prejudicial and reversible error.

Neither party cites law to address whether the exclusion of the temporary modification hearing was properly excluded from the record. The record was excluded based on M.R.A.P. 10(b)(5), 10(e), and 10(f). The court record does not reflect whether counsel for either side complied with the appellate procedural rules.

Rhonda appealed the July 5, 1995, final judgement, motion to reconsider denied on August 16, 1995, rendered by the Leake County Chancery Court, on September 12, 1995. First, the motion for modification should not be included in an appeal of a child custody determination. Although regarding the same set of facts, the modification motion is a second case which requires application of different legal principles. In a child custody case, the Chancellor uses the *Albright* factors to determine the best interests of the children. In a modification for child custody, roughly speaking, the Chancellor determines whether there has been a substantial change in circumstances which adversely

affects the welfare of the child so as to change custody. Second, Rhonda appealed the final judgement on September 12, 1995, which was approximately three weeks prior to the modification hearing. Therefore, the Chancellor did not err in excluding extraneous proceedings which contained facts not at issue at the trial.

However, this Court does in fact have the transcript of the emergency hearing. At the hearing, it was revealed that Boyd spanked Casey. In fact, Boyd spanks all of his children when they act improperly. The last Thursday in September, 1996, Corey brought home a letter from school stating that he had lied to his teacher and failed a test. This was the third letter in roughly ten days. After bringing home the first letter, Boyd warned Casey that he would get a spanking if he continued the behavior. After the second letter, Boyd took away Casey's privileges. The third letter led to the spanking. Casey did in fact have bruises on his behind. However, Chancellor Cortright determined that Casey had not been abused, but possibly spanked a bit hard. The Chancellor concluded:

> ... [C]onsidering the pictures, and considering his testimony, I think [Boyd] in all probability spanked this child harder than he should have. And parents do that.
>
> ....
>
> And in summary, I just don't feel that the evidence adduced on the temporary justifies me taking these children, and Casey in particular, away from the father at this time. Hopefully, if he did overdo the spanking, he will realize -- and apparently does realize that he did act perhaps excessively to some extent. But hopefully he realizes that and won't do it again.

We can not conclude that the Chancellor manifestly erred in his decision.

In conclusion, the Chancellor did not determine that either parent was unfit. In determining proper custody, the Chancellor specifically mentioned how the *Albright* factors applied to the case *sub judice*. The Chancellor did not improperly exclude testimony where counsel failed to comply with discovery. Furthermore, the Chancellor did not err by excluding the modification hearing from the court record. After reviewing the record and transcript, we can not conclude that the Chancellor was manifestly wrong and substantially erred.

**AFFIRMED.**

**LEE, C.J., PRATHER, P.J., PITTMAN, BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**