631 So.2d 196 (1994)
Terry MOAK
v.
Dixie Lou Williams MOAK.
No. 91-CA-465.
Supreme Court of Mississippi.
January 27, 1994.
Paula N. Stennett, Wallace & Stennett, Ridgeland, for appellant.
Ralph L. Peeples, Hobbs Hobbs & Peeples, Brookhaven, William Larry Latham, Hermine M. Welch, Jackson, for appellee.
En Banc.

ON PETITION FOR REHEARING
PITTMAN, Justice, for the Court:
The original opinion is hereby withdrawn and the following opinion is substituted therefor.
This appeal arises from an April 5, 1991, order of the Lincoln County Chancery Court awarding physical custody of two minor children to their mother, Dixie Lou Williams Moak. Finding no reversible error, this Court affirms.

I.
Terry and Dixie Moak were married on September 5, 1970. During their marriage, they adopted two children, William Issac *197 (Will), 13 years old, and Kristina Ann (Kristie), 11 years old.
Terry, a crane operator for the Georgia Pacific Paper Mill, earned an annual gross income of $40,000. His work schedule was based on twelve hour shifts. He had to work the night shift eight nights a month and the day shift seven days a month. On the days that he worked the day shift, he did not get off work until 7:30 p.m.
Dixie was an employee of Packard Electric Company. Her monthly net income totaled $1,807.57. Dixie's work schedule consisted of a five day work week from 8:00 a.m. until 4:30 p.m. After work, Dixie picked the children up at school where they were involved in an after-school program until 5:00 p.m.
On July 4, 1990, Terry and Dixie separated. Dixie left the marital home and took the children with her. Terry filed a complaint for divorce on the ground of adultery on October 5, 1990. Dixie counterclaimed for divorce alleging adultery and habitual cruel and inhuman treatment.
Both Terry and Dixie admitted that some of their marital discontent stemmed from sexual problems caused by a variety of physical conditions. Dixie admitted that beginning in 1985, she had an affair with a co-worker that lasted two years. Even though Terry knew about the affair, they attempted to put their marriage back together when the affair was over.
In 1989, Dixie became romantically involved with Warren Lester, another co-worker. Dixie and Warren refused to answer any questions about the sexual nature of their relationship, although admitted to having feelings of "love and affection" for each other. Wanda Lester, Warren's former wife, was granted a divorce on the ground of habitual cruel and inhuman treatment in November of 1990. She testified that Warren's relationship with Dixie was one of the reasons she filed for divorce.
Dixie rented a trailer when she and the children moved out of the marital home. After Warren and Wanda separated, Warren moved into a trailer next to Dixie's. Warren frequently played ball with his son and Will Moak, ate dinner with Dixie and her children, and helped the Moak children with their homework.
On April 5, 1991, the chancellor granted Terry's petition for divorce on the ground of adultery. Terry and Dixie were found to be fit and proper parents, and the chancellor awarded them joint legal custody of their two minor children. Dixie, however, was awarded physical custody of the children, as well as the exclusive use, occupancy, and possession of the marital home.

II.
Terry contends that the chancellor erred in granting Dixie custody of the children, as well as the exclusive use, occupancy, and possession of the marital home. This Court, however, is "bound by [the chancellor's] findings unless it can be said with a reasonable certainty that those findings were manifestly wrong and against the overwhelming weight of the evidence." Carr v. Carr, 480 So.2d 1120, 1123-24 (Miss. 1985). As for the exclusive use and possession of the marital home, "[it] is certainly an order within the Chancery Court's authority for the `maintenance of the children of the marriage.'" Regan v. Regan, 507 So.2d 54, 58 (Miss. 1987) (quoting Miss. Code Ann. § 93-5-23 (Supp. 1986)).
The chancellor found both Terry and Dixie to be fit parents and vested legal custody of the two children in both. Although he expressed reservations about awarding physical custody to Dixie, he attempted to focus on the best interests of the children rather than on marital fault. The chancellor stated:
The pole star [sic] that the Court's got to look to in determining which of the parents of a broken marriage is going to get custody of the children is one question, what is the best interest of the children under the totality of the circumstances as shown by the evidence. Custody of children is not to be awarded to one parent as a reward for any particular good deed, nor is it to be denied to a parent solely as punishment for any misconduct on the part of a party.
During the hearing, the chancellor had the opportunity to hear considerable testimony upon which to base his decision. In Albright *198 v. Albright, 437 So.2d 1003 (Miss. 1983), this Court set forth the factors to be considered in awarding custody:
We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
Id. at 1005.
Despite their marital problems, both parents have worked hard to provide their children with a good home, excellent educational opportunities, and an active involvement in the church and in the community. It appears that both Terry and Dixie have played active parenting roles, focusing their lives largely on family activities. Even on a day to day basis, Terry has fixed the children's breakfast, brushed Kristie's hair and other routine domestic activities. However, the evidence in the record shows that Dixie has been the primary caregiver, especially with regard to the children's homework and social and church activities.
As the chancellor noted in directing the Moaks to come up with a schedule to provide Terry with liberal visitation rights, his work schedule is "not an odd schedule for him, but it is not the conventional work schedule that we normally deal with ..." His work schedule is based on twelve hour shifts, which enables him to have approximately fifteen days off each month. However, because of Georgia Pacific's rotating shift policy, he must work on the night shift at least eight nights a month. On the seven days each month where he works on the day shift, he works until 7:30 p.m. The record indicates that the only option Terry had considered for child care while he was at work was his elderly mother. She, however, has had a stroke and is limited in her ability to help the children with their homework.
The chancellor properly centered his inquiry into the custody matter on the best interests of the children. He found that Terry and Dixie both were fit and proper persons to have custody of the two children and did in fact vest custody in both of them. The chancellor found that it was best for the physical custody of the children to remain with Dixie, the person to whom the children had always looked for supervision, food, and clothing. Furthermore, Terry was given liberal visitation rights.
The best interests of the children remain the polestar consideration of the courts. The chancellor found the children's welfare dictated that they remain with the mother. Even the father did not dispute Dixie's ability to care for the children. Terry admitted that Dixie was a loving mother who takes care of the children. Terry's mother admitted that Dixie always did a good job of seeing to the children's needs and that the children did well in school.
There does not appear in the record any reason to take custody from Dixie. As for the marital residence, it is a general rule that "it is better to award possession of the martial residence to the party who is given custody of the children." Boykin v. Boykin, 445 So.2d 538, 539 (Miss. 1984).
AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., SULLIVAN, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
BANKS, J., dissents with separate written opinion joined by DAN M. LEE, P.J., and McRAE, J.
*199 McRAE, J., dissents with separate written opinion joined by DAN M. LEE, P.J., and BANKS, J., joins in part.
BANKS, Justice, dissenting on petition for rehearing:
Because the decision of the chancellor leaves substantial doubt as to whether all of the Albright factors were adequately considered, I would reverse and remand for further findings in this regard. Accordingly, I dissent from the majority decision to affirm the judgment below.
DAN M. LEE, P.J., and McRAE, J., join this dissent.
McRAE, Justice, dissenting on petition for rehearing.
The majority is incorrect in not reversing the Chancellor's decision since the Chancellor failed to follow the instructions of this Court in Albright v. Albright, 437 So.2d 1003 (Miss. 1983), and its progeny. Moreover, the Chancellor was manifestly wrong in his fact finding with respect to Dixie's moral fitness as a parent. Because the majority and the Chancellor were manifestly wrong in the fact finding made as to the wife's moral fitness and parenting skills involving the custody of the children and rewards Dixie for her indiscretions and punishes Terry for his exemplary behavior and parenting skills, I dissent.
The majority glibly states that chancellors are to follow the Albright decision which sets forth the elements to be considered in awarding custody of children. The Chancellor did not list the elements and evidence to support his ruling, but simply stated that both parents were fit to retain custody of their children. He awarded both legal custody of their two children ages thirteen and eleven but gave physical custody of the children as well as exclusive use, occupancy and possession of the marital dwelling to Dixie.
While it is true that an adulterous relationship is not to be used as a sanction against a guilty parent in awarding custody of children, it is a factor to consider when that conduct manifests itself into the moral fitness of a parent to raise a child. The case sub judice is not one where the mother had a one time adulterous affair unbeknownst to her children. Evidence clearly shows that not only did Dixie have an adulterous disposition for over four years, but that she split up her paramour's marriage, moved next door to him, frequently cooked meals for him and her children, included him in her children's social and private lives, allowed him to help her children with their homework and publicly flaunted her love for him all while she remained married. For these reasons, the Chancellor was manifestly wrong in awarding Dixie custody of the children and concluding that she was morally fit to raise the children over the husband's parenting skills.
The criteria to consider in awarding child custody according to Albright are as follows:
[age], health, and sex of the child; a determination of the parent that has the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and the capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at an age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
Id. at 1005 (emphasis added).
In Carr v. Carr, 480 So.2d 1120 (Miss. 1985), we noted that the charge of adultery fell within the realm of moral fitness of the parents, stating that:
But moral fitness is but one factor to be considered, and it is a factor worthy of weight in determining the best interest of the child. Adultery of a parent may be an unwholesome influence and an impairment of the child's best interest, but on the other hand, may have no effect. The trial court should consider this factor along with all others when making original custody determinations.
Carr at 1123.
In wanting to reverse the Chancellor's decision awarding custody of the Moak children *200 to their mother, we tread reluctantly along a path that has taken many turns, marked more by changing social values than legal precedent. We remain ever mindful that custody decisions are to be made in the best interests of the children, rather than as a punishment or a reward to the parents. The Chancellor addressed Dixie's behavior although he apparently did not consider it. In doing so, he stated:
I want to say this, Mrs. Moak, your lawyer summed it up in the final remarks he made. You have used some bad judgment. You've used some judgment that really pushed me to the verge of awarding these children to Mr. Moak, and I say that to you advisedly, because child custody is not a permanent matter, it's subject to change at any time where there is conduct that would be detrimental; to the best interest of these children, so I say that for whatever it may be worth down the road.
Absent exceptional circumstances or in those cases where a child was thought to be too young to be separated from his mother, this Court long followed the general rule that an adulterous parent was not entitled to custody of a child. Keyes v. Keyes, 252 Miss. 138, 171 So.2d 489 (1965); Winfield v. Winfield, 203 Miss. 391, 35 So.2d 443 (1948); Hulett v. Hulett, 152 Miss. 476, 119 So. 581 (1928). In more recent years, however, it has been found to be proper to award custody of a minor child to an adulterous mother, when it is in the best interest of the child. Cheek v. Ricker, 431 So.2d 1139, 1144-45 n. 4 (Miss. 1983); Yates v. Yates, 284 So.2d 46 (Miss. 1973); Anderson v. Watkins, 208 So.2d 573 (Miss. 1968). This Court now has come full circle to recognize that "marital fault should not be used as a sanction in custody awards." Carr, 480 So.2d at 1123. However, in Carr, we affirmed the Chancellor's award of custody of the minor children to the father, rather than to the adulterous mother, where there was evidence in the record that the mother's immoral activities extended beyond mere infidelity to excessive drinking and gambling tendencies. Id. at 1122. The Chancellor apparently failed to consider the fact that Dixie had continuous relationships with her co-workers. Dixie's affection began to wander admittedly in 1985 when she embarked upon a torrid two-year romance with co-worker, Mark Stephens. Dixie testified that Terry later knew about this affair, but still tried very hard to mend their marriage and hold their family together. In 1989, her affair with Warren Lester blossomed. Although Dixie and Lester both refused to answer questions during the hearing regarding the sexual nature of their relationship, each admitted to having feelings of love and affection for the other. This in itself is a strong presumption against Dixie's moral fitness. Also, Lester's former wife testified that Lester's consortium with Dixie was the determinative factor in their 1990 divorce. During these wretched years, Terry remained faithful and attended to the needs of the children.
The Moak children were thirteen and eleven years of age at the time of their parent's divorce. Clearly, children at these ages are forming their moral values, and what is she telling them? During her separation preceding her divorce, Dixie moved with her children next door to Lester, and he was a constant visitor in their home. She frequently prepared dinner for him and the children and involved him in helping with the children's homework. The majority sends the wrong message to chancery judges in that they do not have to follow Albright as long as they give lip service to it, ignoring the element of parental moral fitness. This flies in the face of the principles of the basic tenets of parental fitness. The majority ignores Terry's exemplary conduct and parenting skills vis-a-vis his wife's conduct toward their children's moral upbringing, as well as the fact that Terry is home without any work interruption fourteen days a month and only has an evening conflict with his children about seven days a month. The majority turns Terry's "non-traditional" employment against him, but in reality no evidence was presented that his work schedule had an adverse impact upon the children.
Because of her insidious conduct, the majority with its decision today, obviously recognizes the presumption that Dixie is the best person to take care of their children regardless of her conduct, regardless of her moral fiber and regardless of her public *201 statement that she loved another man while she was still married. This is woefully wrong. The Chancellor noted that both parents took active roles in their children's lives and were fit to have custody of the children. This being true, both parents were equally positioned as to all factors, except the moral fitness factor, and as to that factor, Terry had the advantage. Even though the Chancellor stated that he could change custody at a later date, these facts make it virtually impossible for Terry to achieve a judicial modification by the requisite showing of a material change in circumstance which adversely affects the children.
The majority with its decision tells Dixie, "You did a good job of hoodwinking everybody, and you win with the sham that you have committed." Accordingly, I would reverse with instructions to grant custody of the children as well as the occupancy and use of the marital dwelling to Terry Moak.
DAN M. LEE, P.J., joins this opinion.
BANKS, J., joins in part.