736 So.2d 425 (1999)
Dean BELDING, Appellant,
v.
Sharon BELDING, Appellee.
No. 97-CA-00630 COA.
Court of Appeals of Mississippi.
March 23, 1999.
*426 Michael C. Hester, Long Beach, Attorney for Appellant.
William E. Tisdale, Sekul, Hornsby, Tisdale and Baker, Biloxi, Attorney for Appellee.
BEFORE THOMAS, P.J., DIAZ, AND SOUTHWICK, JJ.
SOUTHWICK, J., for the Court:
¶ 1. The Harrison County Chancery Court granted a divorce to Sharon Belding on the ground of her husband Dean's adultery. In addition to the award of custody of their minor son to Mrs. Belding, Mr. Belding claims that the chancellor erred in (1) ordering him to pay $300 per month in child support; (2) awarding the marital domicile to Mrs. Belding and requiring him to pay the mortgage, taxes, insurance, and expenses associated with the home; (3) denying him an award of attorney's *427 fees and assessing all court costs against him; (4) denying his motion for a new trial; (5) refusing to order the psychological summary of Dr. Virginia DeRoma released to him; (6) finding that his adulterous behavior precipitated the breakup of the marriage; and (7) failing to award him sole possession of real property located in the state of Georgia. We find that these issues do not merit reversal and affirm.

FACTS
¶ 2. Dean and Sharon Belding were married in Winder, Georgia in 1988. Three years later, while residing in Hawaii, they adopted their son Robert Benjamin Belding, who was born in Romania on May 18, 1991. Mr. Belding was a member of the United States Navy. From March 1993 to August 1994 the couple was separated while Mrs. Belding was in West Virginia receiving medical treatment and Mr. Belding was stationed in Hawaii. During that time their son was with the maternal grandmother. Mrs. Belding returned to Hawaii and in 1995 the entire family moved to Long Beach, Mississippi as a result of Dean's naval transfer.
¶ 3. The Beldings separated on May 16, 1996. There was evidence presented that at some stage after arriving in Mississippi, Mr. Belding admitted to his wife that he had two adulterous relationships in Hawaii while his wife was gone. On May 24, 1996, Mrs. Belding filed for a divorce on the ground of adultery. During the pendency of the action, the court awarded joint custody of Robert to both Mr. and Mrs. Belding. Mr. Belding was ordered to pay $200 per month as temporary support. All parties were ordered to submit to psychological evaluations.
¶ 4. A trial was held on November 8 and 12-13, 1996. The court entered judgment on January 17, 1997, awarding a divorce to Mrs. Belding on the ground of adultery, awarding primary custody of Robert to Mrs. Belding, and ordering Mr. Belding to pay $300 per month in child support. Mrs. Belding was also awarded the exclusive use, possession and enjoyment of the marital home. Mr. Belding was ordered to pay the mortgage, property taxes, and insurance associated with the home. Mr. and Mrs. Belding were each awarded a one-half interest in their home in Georgia; however, Mrs. Belding was to be responsible for the mortgage, property taxes, and insurance. She was also entitled to any rental income from the property. Mr. Belding's subsequent motions for reconsideration, a new trial, and his request for Dr. DeRoma's psychological summary report were all denied.

DISCUSSION
¶ 5. This Court does not reevaluate the evidence, retest the credibility of witnesses, nor otherwise act as a second fact-finder. Unless the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard, we will affirm. Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997). If there is substantial evidence in the record to support factfindings, no matter what contrary evidence there may also be, we will uphold the chancellor. Smith v. Jones, 654 So.2d 480, 485 (Miss.1995).

I. Child custody
¶ 6. In child custody cases, the best interest of the child must be kept paramount. Sellers v. Sellers, 638 So.2d 481, 485 (Miss.1994). In determining what that interest requires, several factors are considered. They are:
(1) age, health and sex of the child;
(2) a determination of the parent that has had the continuity of care prior to the separation;
(3) which has the best parenting skills and which has the willingness and capacity to provide primary child care;
(4) the employment of the parent and responsibilities of that employment;
(5) physical and mental health and age of the parents;
(6) emotional ties of parent and child;

*428 (7) moral fitness of parents;
(8) the home, school and community record of the child;
(9) the preference of the child at the age sufficient to express a preference by law;
(10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship.
Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).
¶ 7. In his opinion, the chancellor noted that "[t]he custody decision was difficult and a close call." However, after applying the Albright factors, he awarded custody to Mrs. Belding. He made an on-the-record review of each factor after we remanded the issue to him for analysis, and we now have the benefit of the chancellor's precise findings. Since this is the initial and perhaps most significant issue that the parties present to us, we will review each factor in some detail.
¶ 8. At the time of trial, Robert was five and a half years old. The chancellor ruled that although Robert was no longer an infant, "the tender age would slightly favor the mother having custody." Robert's health was also good; therefore, neither party was favored by the chancellor. Because Robert is a boy, the chancellor weighed the factor of the child's sex slightly in favor of Mr. Belding.
¶ 9. The continuity of care factor was found in favor of Mrs. Belding. Mr. Belding, as a member of the United States Navy, was often on deployments and away from home. As a result, Mrs. Belding provided the majority of the care. As to parenting skills, the chancellor held that both parties exhibited "excellent parenting skills." Both parents testified as to their willingness to provide the child's primary care.
¶ 10. Mr. Belding disagrees with the chancellor's finding that Mrs. Belding had been the child's primary care giver in the past. He admits that there were brief periods of separation which resulted from his deployment with the navy. However, most of the separations he attributes to Mrs. Belding. He points to a seventeen month period of separation which occurred when Mrs. Belding returned to West Virginia with Robert in order to seek medical treatment for herself. He and his son were again separated for eleven months when Mrs. Belding left Robert with her mother in West Virginia while she returned to Mississippi to pursue a business venture. Even if these separations were caused by Mrs. Belding, the single factor at question here is who was the child's primary care giver in the past. Between the two parents, for a variety of reasons many of which were not of Mr. Belding's making, the record supports that Mrs. Belding was the primary provider of care.
¶ 11. Mrs. Belding's actions were considered by the chancellor. Although Mrs. Belding's parents may have cared for Robert for a long timespan, that does not weigh in Mr. Belding's favor as to this factor. It also does not reflect very favorably upon Mrs. Belding. The chancellor was not manifestly in error and had substantial evidence to find that this factor favors Mrs. Belding.
¶ 12. The chancellor looked at the nature of Mr. Belding's employment. It requires him to be away from home for long periods of time. Mrs. Belding, a licensed practical nurse, was not employed in that capacity at the time of trial. Rather, she ran a jet ski business and worked for New Image International selling weight loss products. This factor was weighed against Mr. Belding because of his required absences from home.
¶ 13. We disagree that the record requires a finding that Mrs. Belding has no skills and is incapable of supporting Robert. Mr. Belding claims that if Mrs. Belding somehow managed to obtain employment, it would be of the sort which would require her to be away from Robert for most of the day. His argument lacks support *429 and is speculative. The allegation that her salary would be insufficient to support Robert is likewise without foundation.
¶ 14. Both parents were found to be in good physical and mental health. Mr. Belding challenges this finding, arguing that Mrs. Belding is an unstable and unfit parent prone to fits of violence. He cites the fact that she was married five times in an eleven year period. Mr. Belding's expert witness, Dr. Monty Weinstein, testified that this demonstrated a pattern of instability. Dr. Weinstein also expressed concern with Mrs. Belding's tendency to "abandon" her child by leaving him with her parents for extended periods of time.
¶ 15. The chancellor found that the psychological evaluations of the Beldings were more or less even. He was not impressed with Dr. Weinstein and expressly said so in his opinion. Although the court-appointed psychologist, Dr. Virginia DeRoma, diagnosed Mrs. Belding as suffering from "adjustment disorder with mixed emotional features," she also diagnosed Mr. Belding as suffering from "adjustment disorder with anxious mood." Moreover, Dr. DeRoma's evaluation stated that both Mr. and Mrs. Belding were good potential custodial parents. There is as Mr. Belding argues evidence of various troubled periods in Mrs. Belding's life, situations that would have to be weighed by a chancellor in determining whether she was a proper custodial parent. The record indicates that this evidence was considered and found inconclusive.
¶ 16. Mr. Belding also alleges that Mrs. Belding is not in good physical health, as determined by the chancellor. He claims she suffers from fibromyalgia, hepatitis, and chlamydia. He also points to what he contends is her addiction to the prescription drug Xanax. Mrs. Belding admitted that the suffered from fibromyalgia and that she takes Xanax in order to help her sleep. She denied that she had chlamydia or was addicted to Xanax. These largely unsubstantiated assertions are insufficient to overcome the chancellor's finding that Mrs. Belding is in good physical health.
¶ 17. According to Mr. Belding, the chancellor committed further error in determining that each party was morally fit. He argues that this factor should have favored him, as Mrs. Belding is an amoral individual. He asserts that Mrs. Belding was once a prostitute who was imprisoned in West Virginia. Exposing Robert to her relationship with her "business partner" is also evidence of Mrs. Belding's immorality. These unsupported statements are the only evidence of Mrs. Belding's moral unfitness. Whether they are true or not, the chancellor relying on the evidence before him rejected these contentions. We find no error.
¶ 18. The chancellor found the parties to be close in age. Neither party prevailed on the basis of the child's home, school, and community record. Mr. Belding does take issue with this determination, claiming that because of Mrs. Belding's continual moves, Robert will never be afforded an opportunity to participate in school and community activities. However, Mrs. Belding testified that she had no plans to move from the Long Beach area. She stated that she is involved in the PTA at Robert's school. Although she has not taken him to the divorce recovery program in which Mr. Belding enrolled him, she claimed that she was not provided with a schedule. She would take him if given the necessary information. The chancellor did not err in weighing this factor in favor of neither party.
¶ 19. The stability of the home environment seems to be one of the determining factors in the chancellor's decision to award custody to Mrs. Belding. Again, the chancellor cited Mr. Belding's employment and potential deployment. Mr. Belding testified that he was not subject to deployment for at least two years. Moreover, he stated that he could get assignments which did not require sea duty and even expressed his willingness to *430 leave the military if it interfered with custody of his son. However, the chancellor noted that he "could only look at the facts as they were presented at trial. Considering these other speculated changes would necessarily affect other considerations." Because any change in Mr. Belding's employment was speculative at best, the chancellor found that this factor weighed decisively in favor of Mrs. Belding.
¶ 20. The supreme court has held that a chancellor is justified in awarding custody based in part on one parent's work schedule. Moak v. Moak, 631 So.2d 196, 198 (Miss.1994). Mr. Moak's employment required him to work 12-hour shifts, to work the night shift at least eight nights per month, and to work until 7:30 p.m. on seven days each month. Id. This Albright factor was properly weighed in Mrs. Belding's favor.
¶ 21. After a thorough review of the evidence, the chancellor made what he indicated was a difficult decision. We find it to have been within his discretion and do not disturb it.

II. Child support and award of marital domicile
¶ 22. Mr. Belding simply refers to his arguments on custody that we have already reviewed, in further alleging that the chancellor necessarily also erred in ordering him to pay child support and the expenses associated with the marital domicile. Since we have determined that the chancellor's award of custody was proper and no further argument is made separately as to these new points, we undertake no further discussion of the question.

III. Attorney's fees
¶ 23. The court awarded attorney's fees to neither party, as both failed to request it. Mr. Belding was ordered to pay court costs however. He now complains that he should have been awarded attorney's fees because Mrs. Belding's actions resulted in an excessively expensive divorce.
¶ 24. The question of attorney's fees in a divorce action is a matter largely entrusted to the sound discretion of the trial court. Mizell v. Mizell, 708 So.2d 55, 64 (Miss.1998). Mr. Belding was not forced to defend a baseless action. Mrs. Belding's claims were obviously meritorious, as she was granted a divorce and awarded custody of the minor child, Robert. Accordingly, we find that the denial of an award of attorney's fees was proper.
¶ 25. The failure to request fees is not by itself fatal to Mr. Belding's claim. Smith v. Smith, 607 So.2d 122, 127 (Miss. 1992). However, even if Mr. Belding had requested attorney's fees, they should not be awarded unless the chancellor finds that the party can establish an inability to pay. Overstreet v. Overstreet, 692 So.2d 88, 93 (Miss.1997). Mr. Belding did not establish that.
¶ 26. The award of court costs is entrusted to the sound discretion of the chancellor. Brooks v. Brooks, 652 So.2d 1113, 1120 (Miss.1995). The chancellor was within his discretion to order Mr. Belding to pay all court costs.

IV. Summary report of Dr. Virginia DeRoma
¶ 27. In an order setting temporary custody and support, the chancellor ordered the Beldings and their son to undergo psychological evaluation. The examining psychologist, Dr. Virginia DeRoma, prepared lengthy reports that were introduced into evidence by both parties at the trial. She also prepared what is referred to as a single joint summary of the separate reports, a summary that was delivered to the chancellor under seal. The sealed summary was never opened. When it was first mentioned, the court agreed to look at it if both parties would waive their medical privilege. Only Mr. Belding's attorney stated that his client was willing to waive the privilege.
¶ 28. As a result, the chancellor did not review the summary and announced that it was not relied upon in making his decision. Following the hearing, Mr. Belding filed a *431 motion requesting a copy of the summary. The chancellor denied his motion, finding that Mrs. Belding had not waived her medical privilege as to the summary. On appeal, Mr. Belding argues that the chancellor in essence refused to consider relevant evidence.
¶ 29. Before resolving whether either party had a right to the summary or to require the chancellor to consider it, we need to understand the legal basis for the exam. We can find no statutory authority for a chancellor to order disputant spouses to undergo either a mental or physical examination. Parties may agree to submit to the exam and neither party contests the order. In federal court and in many of our sister states, a court may order such an exam. Federal Rule of Civil Procedure 35 provides that "[i]n an action in which the mental or physical condition of a party is in controversy, the court in which the action is pending may order him to submit to a physical or mental examination by a physician...." F.R.C.P. 35. That rule was not adopted in Mississippi. The supreme court rejected a defendant's argument that courts have inherent authority to require a plaintiff to submit to an independent medical examination. Swan v. IP, Inc., 613 So.2d 846, 857 (Miss.1993). Some specific statutes permit medical examinations to be ordered, such as in the worker's compensation arena. Miss.Code Ann. § 71-3-15(2) (Rev.1995). No relevant statute applies here.
¶ 30. Consequently, we find that there was no right to require the mental examination. Our question becomes, after having ordered the examinations and the parties having submitted to them, does the chancellor have to consider every document prepared by the psychologist and do the parties have the right to review each one? The impetus for this issue is a belief on Mr. Belding's part that the summary would support his claims for primary custody.
¶ 31. The chancellor refused to consider the summary because of medical privilege concerns. The physician and psychotherapist-patient privilege is contained in Mississippi Rule of Evidence 503:
A patient has a privilege to refuse to disclose and to prevent any other person from disclosing (A) knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient, or (B) confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family. M.R.E. 503(b).
The supreme court has acknowledged that "an increasing number of jurisdictions have, either by judicial decision or statute, created exceptions to the physician psychotherapist-patient privilege in child abuse and neglect cases, custody and termination of parental rights proceedings when the mental health of the parent could impact the welfare of the child." Lauderdale County Dept. of Human Services v. T.H.G., 614 So.2d 377, 383 (Miss.1992). However, the court refused to create an exception to Rule 503, reasoning that "[s]hould the legislature determine that the privilege should be waived in termination of parental rights cases, it is their prerogative to make the necessary statutory changes." Id. at 384.
¶ 32. Another part of the medical privilege evidentiary rule impacts this issue. "If the court orders an examination of the physical, mental or emotional condition of a patient, whether a party or a witness, there is no privilege under this rule with respect to the particular purpose for which the examination is ordered unless the court orders otherwise." M.R.E. 503(d)(2). The examination was ordered; the summary of the results presumably was relevant to the particular purpose for which the exams were first ordered. The *432 privilege consequently was waived unless the chancellor ordered otherwise. Here he did rule that there would be no release or use of the summarythough the full reports were usedabsent a waiver of the privilege by both parties. That is consistent with the evidentiary rule and we find no error.
¶ 33. As an overview, we note that there is too little in the record for us to determine what the summary would contain. Any contention by Mr. Belding that it contains information favorable to him is speculative at best. The summary presumably is consistent with the full report. Considering that it was sealed, we also presume that there were matters of greater candor, delicacy, or other sensitivity that caused the summary to be treated differently. Those possibilities do not undermine the chancellor's use of his authority to maintain the medical privilege over the summary in the absence of a joint waiver.

V. Adultery as precipitating event
¶ 34. The chancellor found that Mr. Belding's adultery was the precipitating event which led to the breakup of the marriage. Mr. Belding raises the adultery issue on appeal not as a means to undo the divorce, but as part of the argument that he be granted custody. We find no indication that the chancellor relied on Mr. Belding's adultery as the essential or even a significant basis for awarding custody to Mrs. Belding. Thus the point is academic and will not be further discussed.

VI. Award of Georgia property
¶ 35. A home in Winder, Georgia was owned by Mrs. Belding prior to the marriage. Her name alone appeared on the deed. However, both she and Mr. Belding resided in the home prior to and following their marriage. Funds from their joint account were used to make the monthly mortgage payment. Mr. Belding testified that he made substantial improvements to the home as well.
¶ 36. The chancellor found that the home was part of the marital estate. Each party was awarded a 50% interest in the property. Mrs. Belding was ordered to pay mortgage, property taxes, and insurance and to receive all rental income. On appeal, Mr. Belding argues that he is entitled to sole possession of the Georgia home, particularly since Mrs. Belding received the other residence.
¶ 37. The chancellor has authority, "where the equities so suggest, to order a fair division of property accumulated through the joint contributions and efforts of the parties." Brown v. Brown, 574 So.2d 688, 690 (Miss.1990). The supreme court affirmed a chancellor's award of a home to the former wife, even though the former husband purchased the home prior to the marriage. Knutson v. Knutson, 704 So.2d 1331, 1333 (Miss.1997). The chancellor relied on the fact that the "Wife worked and assisted Defendant and contributed to Defendant's being able to continue the mortgage payments and create equity now held in the house and contributed monies she brought into the marriage in renovations to the home."
¶ 38. In the present case, even though Mrs. Belding purchased the home prior to her marriage, the mortgage payments were made from the couple's joint account, and Mr. Belding made improvements to the home. All of this does not entitle Mr. Belding to sole possession of the home but did properly gain him a fifty percent interest in the property.

VII. Motion for a new trial
¶ 39. Mr. Belding's argument on this point consists of the bare assertion that he should have been granted a new trial in this matter. We have found no error in the chancellor's consideration of the issues before him. Consequently the chancellor did not need to reconsider and alter his rulings.
¶ 40. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS *433 OF THIS APPEAL ARE ASSESSED AGAINST THE APPELLANT.
McMILLIN, C.J., KING, P.J., BRIDGES, COLEMAN, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.