820 So.2d 714 (2000)
Effie McCaskill MITCHELL, Appellant,
v.
George Larry MITCHELL, Appellee.
No. 1999-CA-01343-COA.
Court of Appeals of Mississippi.
October 24, 2000.
Rehearing Denied January 9, 2001.
*715 David L. Walker, Batesville, Attorney For Appellant.
B. Leon Johnson, Attorney For Appellee.
BEFORE KING, P.J., LEE, AND MYERS, JJ.
LEE, J., for the Court:
¶ 1. Effie McCaskill Mitchell and George Larry Mitchell were granted an irreconcilable differences divorce. Mr. and Ms. Mitchell consented to the issue of the child custody of their daughter Alexis being determined by the chancellor. The chancellor awarded custody of Alexis to Mr. Mitchell. Feeling aggrieved by the chancellor's decision, Ms. Mitchell filed a timely appeal. Ms. Mitchell presents one issue for our review: Whether the chancellor erred in his application of the factors listed in Albright v. Albright, when he awarded *716 custody of Alexis to Mr. Mitchell. This Court determines that this issue is without merit and affirms the lower court.

FACTS
¶ 2. Ms. Mitchell had four children, including her daughter Alexis which she had with Mr. Mitchell. It is just the custody of Mr. and Ms. Mitchell's daughter, Alexis, that is involved in the case at bar. At the time of the hearing for Alexis's custody, she was two years old; Mr. Mitchell was forty years old, and Ms. Mitchell was thirty-three years old. Initially, Ms. Mitchell was called as an adverse witness by Mr. Mitchell. Ms. Mitchell testified that at the time she and Mr. Mitchell separated, she was employed at the Delta Correctional Facility. Ms. Mitchell usually worked at the correctional facility between the hours of 3:00 p.m. to 12:00 midnight; however, at the time of the hearing she stated that she had changed her work hours to the 8:00 to 4:00 shift and was no longer spending nights in Greenwood. During her examination, Ms. Mitchell was asked to explain whether or not she believed Mr. Mitchell took care of Alexis while she was at work.
¶ 3. In response, Ms. Mitchell asserted that "sometimes" Mr. Mitchell would take care of the children, and that "sometimes" Mr. Mitchell would cook, bathe, dress, and take the children to school; however, if he did not do these tasks, her sister would help. Ms. Mitchell claimed that it was necessary for her sister to assist on occasion because Mr. Mitchell had become angry and violent, so she would take her children, including Alexis, to her sister's house.
¶ 4. Ms. Mitchell admitted that Mr. Mitchell had made numerous attempts to visit Alexis. She denied refusing Mr. Mitchell the opportunity to visit with Alexis; however, she did concede that on Easter she had denied Mr. Mitchell visitation because he desired to take Alexis out of the state. Ms. Mitchell further admitted that when she left Alexis with her sister that she had instructed her sister not to let Mr. Mitchell see Alexis, but she justified her refusal by asserting that this measure was taken because Mr. Mitchell had been away for approximately two months and had not contacted Alexis. Therefore, she wanted Mr. Mitchell to contact her before he came by to see Alexis. Ms. Mitchell also admitted that during their separation she would not tell Mr. Mitchell about any illnesses suffered by Alexis unless he specifically inquired.
¶ 5. Ms. Mitchell testified that when she could not take care of the children her sister or her mother monitored the children. She denied that she consumed alcoholic beverages and stated that she did not frequent nightclubs. When specifically asked whether she had been cautioned about driving the children around in the automobile while she was under the influence of alcohol, she once again denied that she drank. Ms. Mitchell also denied having any emotional problems.
¶ 6. Ms. Mitchell initially denied that she had left her children unattended; however, upon further questioning, she conceded that it may have happened, but it was just while she "ran up the street for a minute." She stated that she had not left them unattended for hours at a time. Ms. Mitchell also contested the assertion that Alexis had been left unattended out on the lawn and in the street at her sister's house. Ms. Mitchell claimed that when she stayed in Greenwood due to the demands of her employment, she would leave her children with her family. Next, Ms. Mitchell was questioned about possible physical abuse to Alexis and did not recall Alexis having a long burn on her forehead. She also repudiated the contention that Alexis had any cuts and explained that the *717 only time Alexis had suffered a laceration was when she was wearing her glasses and had fallen, and her glasses cut her. Ms. Mitchell stated that Alexis had been taken to the hospital twice for treatment because of cuts from her eyeglasses. Ms. Mitchell contended that she had spoken with Alexis's eye doctor about the situation, but that the doctor said there was nothing that could be done; therefore, she continued to allow Alexis to wear the eyeglasses. Additionally, Alexis had incurred a black eye which Ms. Mitchell asserted occurred while Alexis was playing. Furthermore, Ms. Mitchell admitted that Alexis had blisters on her head, but alleged that the blisters were caused from her hair being pulled too tight by her barrettes. When questioned about ant bites on Alexis, she denied that Alexis had ant bites, but instead called these marks "blisters" and explained that it might have been the chicken pox. However, she had forgotten what the doctor had said regarding the bumps.
¶ 7. Ms. Mitchell admitted that Alexis and Mr. Mitchell have a relationship and that Alexis talked about him.
¶ 8. Ms. Mitchell denied that she had a boyfriend in Greenwood that diverted her attention away from her children. The next witness that was called by Mr. Mitchell was Katherine Ewing.
¶ 9. Mrs. Ewing testified that she knew Mr. and Ms. Mitchell; however, between the two she was more acquainted with Mr. Mitchell. She stated that she had had the opportunity to see Alexis during Mr. and Ms. Mitchell's time of separation. On one occasion, Mr. Mitchell had brought Alexis to her house and had inquired about bumps on her body.
¶ 10. Mrs. Ewing asserted that since she had children she first thought it was chicken pox; however, upon closer examination she thought they looked like ant bites, or insect bites. Nevertheless, Mrs. Ewing was not sure and suggested that Mr. Mitchell might want to take Alexis to see a doctor to determine the cause of the bumps. Mrs. Ewing was asked whether she had the opportunity to see Alexis again.
¶ 11. Mrs. Ewing claimed that she did and on that occasion Alexis had a scar on her left forehead, above her eye. She did not think that eyeglasses were the cause of the scar. Mrs. Ewing stated at this time Alexis appeared to be fairly clean. Mrs. Ewing was also called upon to testify regarding her observations of the relationship between Mr. Mitchell and Alexis.
¶ 12. Mrs. Ewing claimed that what she viewed was fatherly love and that Alexis was free to be herself around him. Additionally, she stated that she had never heard Mr. Mitchell raise his voice to Alexis, and Alexis appeared to listen to him. Mrs. Ewing classified Mr. Mitchell's relationship with Alexis as "good". Mrs. Ewing testified that when she saw Alexis with Mr. Mitchell she was presentable, and that although she did not look to have been groomed by one's mother, it appeared he was caring for her.
¶ 13. On cross-examination, Mrs. Ewing conceded that children have accidents and that even her children had been in a fire-ant bed. Additionally, she said that she would not disagree with a doctor if he had stated that what she thought might be ant bites was indeed chicken pox. Furthermore, Mrs. Ewing stated that she did not know how the cut over Alexis's eye occurred, and that it was possible that her eyeglasses could have caused the injury if she had fallen while wearing them. The next witness presented by Mr. Mitchell was Sandra Crump McLove.
¶ 14. Ms. McLove testified that she knew Mr. Mitchell and Alexis and that Mr. *718 Mitchell would bring Alexis to see her at the sheriff's department where she worked. The first time that she saw Mr. Mitchell with Alexis, Alexis had sores in her head. Ms. McLove claimed that some of the sores looked like little blisters and some looked like ring-worm. Ms. McLove also stated that Alexis was not clean and that Mr. Mitchell claimed that that was the way she looked when he picked her up. Ms. McLove continued testifying and explained about the second time she saw Mr. Mitchell with Alexis.
¶ 15. Ms. McLove asserted that on the second occasion Alexis was fairly clean and that she did not have sores in her head. She inquired whether Mr. Mitchell had gotten medication for Alexis and he said no, and that when he tried to discuss the sores with Ms. Mitchell she would not talk about it with him. Ms. McLove explained that on the third and final occasion that she saw Mr. Mitchell with Alexis it appeared from both sight and smell that her pony tail had been burnt; however, Mr. Mitchell did not know how it happened and stated that he had gotten Alexis in that condition.
¶ 16. On cross-examination, she admitted that if it was ring-worm that Alexis had, that children usually get this, and in fact, her own son had come home from school with something similar to ring-worm or what she called "tatter." Additionally, regarding Alexis's appearance, she agreed that the child could have gotten dirty after Mr. Mitchell had picked her up. The next witness was Ms. Olivia Stewart.
¶ 17. Ms. Stewart and Mr. Mitchell attended the same church. Ms. Stewart claimed that she had seen Mr. Mitchell with the children at church "all the time," and that it was only "occasionally" or "very seldom" that she saw Ms. Mitchell at church. Additionally, she testified that even after the separation she saw Mr. Mitchell at church with Alexis. Ms. Stewart asserted that Mr. Mitchell took care of Alexis and that their relationship was good.
¶ 18. On cross-examination, Ms. Stewart stated that she could not say whether Ms. Mitchell was attending church elsewhere after Mr. and Ms. Mitchell separated. Additionally, she acknowledged that she really did not know whether Ms. Mitchell was a good mother and took care of Alexis. Next, Mr. Mitchell called R.C. Stewart to testify.
¶ 19. Mr. Stewart essentially supported the prior testimony given by Ms. Stewart. Thereafter, Mr. Mitchell presented the testimony of Christine Durr.
¶ 20. Ms. Durr testified that she and Mr. Mitchell had known each other for approximately three years. Ms. Durr explained that she and Mr. Mitchell attend the same church and sing together in the choir. Ms. Durr claimed that she and Mr. Mitchell had been dating since January 1999. Additionally, Ms. Durr stated that occasionally she does hair and recalled a time in February when Mr. Mitchell had brought Alexis to see her so she could fix her hair. The following were Ms. Durr's observations of Alexis on this occasion:
Well, she had some bumps in her hair, and her hair, it was just standing up on her head, and burnt on the top. So he asked me to wash it and grease it, so She had some little bumps in her head.... I couldn't really tell what they were. It was little ole red spots, all in her head. But her hair was burnt on the top, because her hair was all over her head. I mean, just standing on top of her head.
Additionally, she contended that Alexis's hair had not been combed, she was not dressed and was not clean. Mr. Mitchell *719 then had Ms. Judy White testify before the court.
¶ 21. Ms. White worked with the Department of Human Services in Grenada County as a social worker. Ms. White had investigated a call involving Alexis. In September 1998, it was reported that Alexis and her cousin were unsupervised in the middle of the road. Both children were returned to their grandmother's house. She described the street where the children were located as busy with several hills. At the time of the incident Ms. Mitchell's mother was keeping the children.
¶ 22. Ms. White claimed that when she questioned Ms. Mitchell's mother about the situation she stated that this had happened before, and that although Alexis was about twenty-five months old and her cousin was slightly over one year old, that her cousin "knew how to get a broom and punch up the latch on the door." It was noted that at the time Ms. White talked to Ms. Mitchell's mother about the aforementioned situation she did not have an explanation as to why she allowed this to continue to happen. She testified that she had also attempted to discuss the situation with Ms. Mitchell; however, she was getting ready for work and did not have a lot of time for discussion. Ms. White speculated that something might have been done about the latch and that she believed that Ms. Mitchell had Alexis staying with her sister. Ms. White also testified that on one occasion she had taken pictures of Alexis.
¶ 23. She asserted that she took these pictures at the request of Mr. Mitchell when he had brought Alexis to the Welfare Department. It appeared that the child had impetigo, except the places looked more like welts on her back. At this time, the department told Mr. Mitchell that Alexis looked like she had anemia and that he should have that and the places on her back examined. However, Ms. White confessed that she had no knowledge regarding whether Mr. Mitchell took Alexis to the doctor. Finally, Mr. Mitchell testified on his own behalf.
¶ 24. Mr. Mitchell explained to the court that he wanted custody of Alexis because he felt she was not being properly monitored. Mr. Mitchell said that when he and Ms. Mitchell were still living together, most of the time, they would share the responsibility of taking care of the children. "When she worked, I looked after them; and, if I was working, then she had a babysitter look after them, until I got off from work." Mr. Mitchell claimed that seventy or eighty percent of the time he was the one to assist the children in the morning, and he would also cook for the children. He described his relationship with Alexis as "good," and his testimony was consistent with that given above regarding his and Alexis's church involvement.
¶ 25. Mr. Mitchell explained that he had documented several times during the separation when he went to visit with Alexis and Ms. Mitchell's other children, and he was refused the right to do so. Mr. Mitchell had also documented several instances where Mrs. Mitchell had left Alexis unsupervised.
¶ 26. Mr. Mitchell contended that he did not drink alcoholic beverages, but on occasion Ms. Mitchell would. He also denied having any emotional problems and contended that although he had been hospitalized, it was due to a reaction he had when he combined alcoholic beverages with prescription anti-depressants, not for a nervous breakdown.
¶ 27. Mr. Mitchell asserted that he had seen a scar over the child's eye, sores in her head, a burn on her forehead, and ant *720 bites. He claimed that he was informed by Ms. Mitchell's sister that Alexis received the burn by pulling a curling iron down on herself. Mr. Mitchell went on to explain that he believed Alexis suffered from ant bites because when he asked the individual she was with where she had gotten the bites, he explained that he had been playing with Alexis, and he had put her down in an ant bed. Mr. Mitchell testified that he inspected Alexis and there were still ants inside her pants biting her.
¶ 28. Mr. Mitchell expressed that he was in good health and that he was already prepared to receive custody of Alexis. He testified that he had obtained new employment and his work schedule required him to work from 7:00 to 3:00. Mr. Mitchell conceded that he made nine dollars an hour at his previous employment, and he made seven dollars an hour at his current employment, but believed that he was financially able to take care of Alexis. Mr. Mitchell maintained that he would be available to take Alexis to school and had already inquired about Alexis's placement with a day care and Head Start. Additionally, during the instances when he was away for his military training he had someone to care for Alexis and was not opposed to Ms. Mitchell's keeping the child for these periods of time. Mr. Mitchell stated that he had a three bedroom apartment and that he already had a room and a bed for Alexis.
¶ 29. Mr. Mitchell asserted that Ms. Mitchell was not a good housekeeper, providing not only testimony but photographs to support this contention.
¶ 30. Mr. Mitchell admitted that he did not attend a lot of the children's school functions, but stated that Ms. Mitchell also did not attend the functions. Next, Ms. Mitchell presented her case-in-chief.
¶ 31. When Ms. Mitchell testified on her own behalf she stated that a lot of the negative qualities that were testified to about her were either untrue or she had an explanation.
¶ 32. Ms. Mitchell stated as to the accusation of her being a "sloppy" housekeeper that the picture of the house was taken at a time when she was in the process of relocating from her marital dwelling. She explained a picture of Alexis on the mattress placed on the floor with alleged ant bites on her body by proclaiming that she did not see the ant bites, and that Alexis was on the mattress on the floor because she had taken the bed. Ms. Mitchell agreed that her and Mr. Mitchell's initial separation had been on again/off again; however, they separated for the last time when she claimed Mr. Mitchell threatened to kill her. She claimed this threat occurred after she and Mr. Mitchell had appeared in justice court due to a confrontation that had ensued between them.
¶ 33. Ms. Mitchell stated that in regards to what had been classified as "ant bites" or "welts" she had taken Alexis to a doctor at the health department and they said it was probably a light case of chicken pox and that she was anemic.
¶ 34. Ms. Mitchell asserted that her husband had had some emotional instability in the past and contended that he had told her that this occurred when he was going through a divorce and had had a close relative die. Ms. Mitchell further stated that Mr. Mitchell had never mentioned that he was hospitalized because of alcohol or pills. Additionally, Ms. Mitchell described Mr. Mitchell's temperament.
¶ 35. Ms. Mitchell testified that in public Mr. Mitchell was "mild-mannered," but went on to explain that when Mr. Mitchell was at home he was "very violent, loud, and abusive." Ms. Mitchell next described her current living situation and her future plans for Alexis.
*721 ¶ 36. She stated that she lived in a duplex next to her sister and that there were three streets between her house and her mother's. Ms. Mitchell said that when Alexis turns three she could apply for Head Start, but at the time she had been instructed that daycare was not available because all of the openings were filled. Ms. Mitchell asserted that although she sometimes worked on Sundays, she was attending church at the New Tuscahoma A.M.E. church in Holcomb and that she took all her children with her when she could attend, and that if she could not attend church her sister would take them to her church.
¶ 37. Ms. Mitchell testified that she desired for Alexis to live in a happy home and obtain a good education, this included attending college.
¶ 38. Ms. Mitchell also contended that at times during their marriage Mr. Mitchell had girlfriends. When asked on cross-examination whether he had a girlfriend or he was employed to work in the woman's yard, she admitted that Mr. Mitchell told her he was employed to cut her grass; however, she did not believe him. The next witness was Carolyn Campbell.
¶ 39. Ms. Campbell is a first cousin to Ms. Mitchell and claimed that she and Ms. Mitchell were very close; however, she would avoid Mr. Mitchell because he had a tendency to want to discuss his and Ms. Mitchell's personal business. Ms. Campbell testified that she had interacted with both Mr. and Ms. Mitchell while they were married, and that in her opinion, Ms. Mitchell would be the best person to have Alexis because Mr. Mitchell did not want the "knee baby" to sit in Ms. Mitchell's lap. Additionally, Mr. Mitchell made his business everybody else's business. Next, Corrina McCaskill Tippett testified.
¶ 40. Ms. Tippett was one of Ms. Mitchell's sisters and, in fact, was one of the care givers for Alexis. Ms. Tippett disputed that she had any problems with gangs around her house.
¶ 41. She explained that she had four children of her own and a niece and nephew that she took care of and all six children lived in her house. Ms. Tippett asserted that while school was in session from 8:30 to 4:00 just Alexis would be in the house and that usually around 5:00 Ms. Mitchell would come get Alexis. Ms. Tippett denied that she left Alexis alone at her house.
¶ 42. Although Ms. Tippett testified that she had not been around Mr. Mitchell much, she saw him as vindictive and selfish and questioned his stability. On cross-examination, she admitted that she and Mr. Mitchell did not like each other.
¶ 43. Ms. Tippett testified that she did not remember bites and welts on Alexis, and although she admitted that Alexis had had a rash before, she continued to deny that Alexis had had ant bites. Ms. Tippett alleged that she had witnessed Alexis fall and receive a cut from her eyeglasses and that Alexis did not have a curling iron burn, but instead she had walked into something. Ms. Tippett claimed that the child ate well and that meals were prepared for her.
¶ 44. Ms. Tippett contended that she use to let Mr. Mitchell take Alexis; however, she stopped when she became concerned that Mr. Mitchell might take Alexis out of the state. Other than Mr. Mitchell's rebuttal testimony, Ms. Tippett's testimony concluded the case.

STANDARD OF REVIEW
¶ 45. When this Court reviews the decision of a chancellor relative to child custody we will not disturb that decision unless the chancellor was manifestly wrong, clearly erroneous, or applied an *722 erroneous legal standard. Limbaugh v. Limbaugh, 749 So.2d 1244 (¶ 9) (Miss Ct. App.1999).

DISCUSSION

I. WHETHER THE CHANCELLOR ERRED IN HIS APPLICATION OF THE FACTORS LISTED IN ALBRIGHT V. ALBRIGHT, WHEN HE AWARDED CUSTODY OF ALEXIS TO MR. MITCHELL.
¶ 46. Ms. Mitchell argues that the chancellor abused his discretion when he awarded custody of Alexis to Mr. Mitchell, and that the factors enumerated in Albright v. Albright, 437 So.2d 1003, (Miss. 1983), favor her. Additionally, Ms. Mitchell contends that the best interest of the child would be accomplished by placing custody of the child with her.
¶ 47. It was reiterated in Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), that the polestar consideration in determining custody is the best interest and welfare of the child. See Lackey v. Fuller, 755 So.2d 1083 (¶ 20) (Miss.2000); Sobieske v. Preslar, 755 So.2d 410 (¶ 3) (Miss.2000). In Albright, the Mississippi Supreme Court also acknowledged the weakening of the tender years doctrine in determining who is the proper parent to receive the custody of the child. Id. The age of the child is just one factor to be considered by a chancellor when making a determination of custody and should carry no more weight that any of the other factors. Id. In Albright, 437 So.2d at 1005, the Mississippi Supreme Court listed several factors to be considered by a chancellor when determining which parent should receive the custody of the child or children in question. Those factors are as follows:
health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
This Court notes that in the case at bar, the chancellor did not recite each Albright factor; however, he did expressly address several of the factors and stated in his opinion that he had re-read the Albright factors as they related to the facts. The chancellor expressed that he was concerned about present harm to Alexis, and that he believed the Albright factors favored the father, more than the mother. In Hamilton v. Hamilton, 755 So.2d 528 (¶ 10) (Miss.Ct.App.1999), this Court remanded a case back to the trial court for its failure to address each of the Albright factors. However, subsequently, in Sobieske v. Preslar, 755 So.2d 410 (Miss. 2000), a divided Mississippi Supreme Court addressed the issue of whether the Albrightfactors must be specifically enumerated by a chancellor to adjudge that his or her holding is valid regarding child custody. In Sobieske, the chancellor failed to address each Albright factor before he awarded child custody. Id. (¶ 12). The majority of the Mississippi Supreme Court held that while they would have preferred to have had the Albright factors expressly enumerated; nevertheless, when considering the deference that must be shown to a chancellor, it could be inferred by the chancellor's mention of Albright that he had considered those factors. Id. at (¶ 12). Therefore, in the present case, in light of *723 the chancellor's dissertation which is in part enumerated below and his mention of Albright, we too allow an inference regarding the Albrightfactors that were not addressed.
¶ 48. The chancellor specifically considered the demands of each parents employment. Additionally, the chancellor considered the care that had been provided by each parent to Alexis, and that due to Ms. Mitchell's work schedule, Mr. Mitchell had performed duties that the chancellor felt the wife would normally perform. Furthermore, the chancellor weighed Alexis's young age and noted that she was almost three years old but determined that it was just one factor to be considered and was not outcome determinative. It was apparent that the chancellor considered the best interest and welfare of Alexis when he stated "this child needs to be treated, the way she is entitled to be treated, and cared for, the way she had better be cared for." The chancellor observed that Ms. Mitchell had family who took care of the child, but not the way the child needed to be taken care of; however, Mr. Mitchell was there to take care of the child. It is also evident that the chancellor agonized over his decision when he stated:
I can tell you, the Albrightfactors favor the father, more than they do the mother. I'll tell you another thing, that, if the mother were in the [same] circumstance as the father, I would have rendered the decision, earlier, and the mother would get the custody of the child. I just think it would have been easier. Then I tried to figure, well, what am I doing? Am I penalizing this man, because he is a man? Am I penalizing him, because he is the father and not the mother? In effect, that's what I would be doing. In effect, that's, exactly, what I would be doing; because, if the circumstances were reversed, and he were, in effect, in control of all four of these childrenthey were his, and not her'sI'm talking about, if those other three were his by a prior marriageand they had this one, and he did or failed to do what she did or failed to do, then, actually, you all wouldn't have been arguing about this. I'll guarantee, you wouldn't have been arguing about it. The real argument is, without it being said, is, that he is a man. Well, Albright reduceddidn't eliminate, but reduced the one factor, out of many, the age of the child. That's what it did. And, so, if I were to look at it in that fashionand I can't penalize somebody because they are a man or a woman, but I can take certain things into consideration.
This Court has reviewed the testimony presented in the aforementioned "facts" portion of this opinion in conjunction with the chancellors' findings of fact and conclusions of law and determines that no error was committed by the chancellor. Accordingly, we affirm the decision of the lower court.
¶ 49. THE JUDGMENT OF THE CHANCERY COURT OF GRENADA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., IRVING, MOORE, MYERS AND PAYNE, JJ., CONCUR. BRIDGES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY THOMAS, J.
BRIDGES, J., dissenting:
¶ 50. I must respectfully disagree with my colleagues in the majority on their decision that the chancellor properly applied the Albright factors when he awarded custody of Alexis to Mr. Mitchell. It is my opinion that the majority should not *724 "infer" that the chancellor adequately studied each Albright factor thoroughly in making his custody decision simply because the chancellor stated that he believed that the Albright factors favored Mr. Mitchell. In reviewing the divorce decree, which includes the order for child custody, I find nowhere that the chancellor mentioned his specific findings as to each Albright factor. This is of great concern to me.
¶ 51. As has been stated by the majority, our chief consideration must be the best interest of the child. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). While I recognize that the chancellor alluded to the fact that he considered the Albright factors in reaching his decision on the custody of Alexis, it is my opinion that he erred when he did not address and discuss each of these factors separately and distinctly. It matters not whether I or the majority agree with the ultimate outcome of the custody issue since our primary task as the reviewing court is only to evaluate whether the chancellor's decision was manifest error based on a proper analysis of each Albrightfactor. Id.
¶ 52. In Hayes v. Rounds, the Mississippi Supreme Court clearly stated that "although the court explicitly acknowledged that the Albright factors apply to the present case, it is not clear whether the court properly applied the factors." Hayes v. Rounds, 658 So.2d 863, 865 (Miss.1995). Moreover, the supreme court noted that "[w]hile we cannot say that the chancellor's conclusion is so lacking in evidentiary support as to be manifest error, in the absence of specific findings we cannot affirm with confidence that the best result has been reached." Id. at 866.
¶ 53. Also, in Hamilton v. Hamilton, this Court reviewed the record in that case and found that while the chancellor expressly stated that he considered certain factors found to be necessarily addressed in the Albright decision, he "did not specifically address the remaining [factors]. It is for this reason we reverse and remand for the purposes of addressing each of the Albright factors." Hamilton v. Hamilton, 755 So.2d 528 (¶ 10)(Miss.Ct.App.1999)(emphasis added). Further, this principle was reiterated in the dissents by Honorable Justices Lee, Banks and McRae in Moak v. Moak, 631 So.2d 196, 199 (Miss.1994). Justice McRae opines and Justice Lee joins in the following:
The Chancellor did not list the elements and evidence to support his ruling, but simply stated that both parents were fit to retain custody of their children. * * * [As such,] [t]he majority is incorrect in not reversing the Chancellor's decision since the Chancellor failed to follow the instructions of this Court in Albright v. Albright. ...
Moak, 631 So.2d at 199. Justice Banks, in a separate dissent to the Moak decision proclaims, "[b]ecause the decision of the chancellor leaves substantial doubt as to whether all of the Albright factors were adequately considered, I would reverse and remand for further findings in this regard." Id.
¶ 54. The majority relies in part on the Mississippi Supreme Court case of Sobieske v. Preslar, 755 So.2d 410 (Miss. 2000) to support their decision that the proper determination of custody based on the Albright factors may be inferred here. However, it is my opinion that Sobieske-does not necessarily rule our decision in the case at bar. In the first place, Sobieske deals with a custody modification rather than the initial custody decree as is our issue here. Id. at 411. In Riley v. Doerner, 677 So.2d 740, 743 (Miss.1996), the court noted that a modification of custody may be had where the plaintiff demonstrates that there is a material change in *725 circumstances that would, in the child's best interest, necessitate such a modification. This clearly indicates to me that the chancellor's decision in a custody modification rests on a change in the current circumstances of the child that would warrant a different result from that of the initial custody decree. In other words, at this juncture, an assessment of each Albright factor would have already been made in the chancellor's findings on the initial custody decree. In my opinion, this would connote that the findings as to the Albright factors in a custody modification would be narrowed slightly to those factors that are implicated in the petition for modification, rather than reiterating those factors which were earlier discussed and not in issue on such petition. For example, in Sobieske, the chancellor only mentioned the Albright factors that concerned him as to the issue of a change in custody, i.e., stability of the home and the fitness of each parent. Sobieske, 755 So.2d at 413.
¶ 55. Secondly, I am not inclined to be swayed by the decision in Sobieske because I am not convinced that the Mississippi Supreme Court intended for reviewing courts to infer in all custody cases that a chancellor took into account all of the Albright factors simply because he said that he did. While the supreme court decided this to be the proper conclusion in Sobieske, I am not convinced that the court was proposing that this should be the answer in all such cases. As evidenced by the case law that I have cited above and the case law cited by the majority, the court appears to be split on this issue of the degree of specificity of the Albright factors in child custody decisions. The language used in Sobieske seems to not only make this point clear, but appears to continue to give preference to the idea that chancellors should spell out each Albright factor separately and distinctly: "While it certainly would have been preferable for the Chancellor to have expressly considered each Albright factor, it is perhaps understandable that he did not do so in the present case...." Sobieske, 755 So.2d at 412 (emphasis added). This convinces me that, in no way, did the supreme court purport to change the preferred idea of specificity in discussing the Albright factors. Rather, the court seems to conclude that, depending on the facts of the case, it may, in certain instances, be an acceptable method to simply make an inference of the chancellor's views on those factors, i.e., in cases involving custody modification. I am of the opinion that it is not this Court's place to adopt a view that it is acceptable for chancellors to be lax in their findings on the Albright factors, in essence, overruling cases that have come out of the supreme court in the recent past. I feel that if the supreme court meant for the concept of finding the Albrightfactors with specificity to be voided by Sobieske, it would have done so in no uncertain terms. Therefore, I am convinced that the majority has relied too heavily on Sobieske and taken the supreme court's intentions out of context. As such, I cannot take the view that Sobieske purports to overrule the precedent that lies in favor of finding the Albright factors with detail and specificity.
¶ 56. It is my opinion that making specific findings as to each of the factors in the Albright case is a necessary step in the chancellor's process of deciding on his initial decree of child custody. I find that, in the instant case, these specific findings are not present. I am convinced that this is crucial in giving reviewing courts the opportunity to make an appropriate and thorough evaluation of a chancellor's ruling in a child custody case. In the absence of specific findings in the record on each Albright factor, I cannot, in good conscience, agree with the majority on this issue because I am not satisfied that each *726 and every factor was given its due consideration and equal weight. As such, I am not persuaded that the chancellor assuredly considered the best possible interest of Alexis.
¶ 57. It is my hope that, in the future, chancellors finding themselves in the position of answering the monumental question of where a child will be placed, will recognize the benefits of making these specific findings in order that the best conceivable interest of the child is realized. With all due respect to my esteemed colleagues in the majority, I would reverse and remand this case for a hearing on each of the factors to be considered in Albright.
THOMAS, J., JOINS THIS SEPARATE OPINION.