## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 1999-CA-00983-SCT

*ADAM L. BLEVINS*

*v.*

*DAWN ELIZABETH BARDWELL*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/05/1999 |
| TRIAL JUDGE: | HON. MARGARET ALFONSO |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN C. JOPLING |
| ATTORNEY FOR APPELLEE: | KEITH PISARICH |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 04/19/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/10/2001 |

**BEFORE PITTMAN, C.J., MILLS AND WALLER, JJ.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1. Adam L. Blevins appeals a chancery court judgment awarding the permanent paramount care, custody and control of his daughter Darby Colleen Blevins to her mother Dawn Elizabeth Bardwell (Funsch).

### FACTS AND PROCEEDINGS BELOW

¶2. Adam Blevins and Dawn Bardwell (now Funsch) met in June of 1996 while both were stationed at Keesler Air Force base in Biloxi, Mississippi. After a period of friendship, they became romantically involved. This brief relationship temporarily ended just a few weeks before Dawn married her "high school sweetheart," Jason Singleton, that August. About a month later Dawn began treatment for stress and depression at the Keesler Mental Health Clinic. Despite Dawn's marriage, Adam and Dawn renewed their romance. While still married to Jason, Dawn discovered that she was pregnant and received an honorable discharge from the Air Force. She then moved in with Adam in January of 1997. From that time forward Adam and Dawn lived together and proclaimed themselves a couple.

¶3. Darby Colleen Blevins was born July 19, 1997. Over the following two weeks a DNA parentage test was administered; Dawn's divorce from Jason was finalized; and it was conclusively proven that Adam was Darby's biological father. Adam and Dawn continued to co-habitate unmarried and care for their daughter, with Dawn being the primary care giver. During this time Adam worked full time, and Dawn held a part time job. Both admitted in testimony that it was their intention to marry at some point in the future.

¶4. Eventually Dawn decided to reenlist in the Air Force. Because the Air Force prohibits custodial single parents from enlisting, Dawn executed a "Order Approving Custody of Child" granting custody of Darby to Adam. At the time both believed they would marry at the conclusion of Dawn's technical training, or alternatively, once Dawn gained "permanent party" status, she would regain custody of Darby without

jeopardizing her position in the Air Force. Adam and Dawn agree that they intended the change of custody to be a temporary arrangement.

¶5. Dawn left for technical training in July of 1998. Adam served as the primary care giver for Darby over the next 9 months. After Dawn came home on leave in September of 1998, relations became strained between the couple. By the end of her five-day leave Dawn and Adam had ended their relationship. Before leaving for her new assignment at Lackland Air Force Base in San Antonio, Texas, Dawn expressed her desire to take Darby with her since Dawn had successfully attained "permanent party" status. Adam refused to allow Dawn to take Darby citing his custody rights per the "Order Approving Custody of Child." Dawn and Adam have not lived together since.

¶6. A month after her arrival at Lackland Air Force Base, Dawn filed her Complaint in the Chancery Court of the Second Judicial District of Harrison County, Mississippi, for Change in Custody and Other Relief in the hope of regaining custody of Darby. While working at Lackland, Dawn met Anthony Funsch, whom she later married prior to the custody hearing. Dawn claims that in the months leading up to the custody hearing, while Darby was still in her father's custody, Adam was uncooperative in allowing visitation and promoting a close relationship between Dawn and Darby. Dawn also asserts that, on occasion, the chancery court was forced to implement visitation on behalf of Dawn, although there is nothing in the record to support this assertion. Prior to the court hearing in April of 1999 Adam and Darby moved to Melbourne, Kentucky, so that Adam could be with his father who was suffering from a number of serious illnesses.

¶7. After a four-day hearing, the chancellor issued the court's Memorandum Opinion and Judgment providing the following: 1) the prior order which awarded custody to Adam was a temporary, non-final adjudication of custody; 2) joint legal custody of Darby was awarded to both parties; 3) paramount care, custody and control of Darby was awarded to Dawn; 4) visitation was awarded to Adam, and 5) Adam was ordered to pay child support. From this judgment Adam appeals the award of paramount care, custody and control of Darby to Dawn.

## DISCUSSION

### I. DID THE TRIAL COURT CORRECTLY DETERMINE THAT THE CUSTODY AGREEMENT WAS TEMPORARY?

¶8. Once Dawn decided to reenlist in the Air Force, she executed an "Order Approving Custody of Child" granting custody of Darby to Adam. This order was made by then Chancellor William Stewart. The order did not state that it was a temporary custody arrangement.

¶9. In her "Memorandum Opinion and Judgment," Chancellor Margaret Alfonso, who had been elected to the post previously held by Chancellor Stewart, stated she was "clearly convinced the intention of the agreement and Order was that the custody was only of a temporary nature, only until Dawn obtained 'permanent party' status in the military." Chancellor Alfonso determined that the order was "a temporary, non-final adjudication of custody."

¶10. At the time of their agreement regarding Darby's custody, Dawn and Adam intended to marry sometime after Dawn completed her training in the Air Force. Ultimately, they did not marry, and there was a need for the hearing below to determine permanent custody. It is undisputed that both parties voluntarily stipulated that the custody agreement made before Dawn's reentry into the Air Force was temporary in

nature. Because single mothers with custody of children are not allowed to reenlist, the chancellor duly noted the pressure on Dawn to agree to the custody order so that she could return to the Air Force.

¶11. On its face, the "Order Approving Custody of Child" granting custody of Darby to Adam contains no language to indicate that it is anything but an order for permanent[1] custody. This Court gives great deference to the sanctity of orders made by chancellors and the belief that orders should be followed as they are written. <u>We are able to revisit this order because both parties agree that it was intended to be temporary.</u>

¶12. It is this Court's inclination to rule that the order was permanent, however, deference should be given to the Chancellor and the wide discretion she enjoys as finder of fact in matters such as this. This Court has stated:

> a chancellor's decision cannot be disturbed "unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or an erroneous legal standard was applied.". ***Madden v. Rhodes***, 626 So.2d 608, 616 (Miss.1993) (citations omitted). A chancellor sitting as a finder of fact is given wide discretion.

*Griffin v. Campbell*, 741 So.2d 936, 937 (Miss. 1999).

¶13. Finally, and of greatest importance as this is a child custody matter, we must defer to the polestar consideration in every child custody case, the best interests of the child. ***Albright v. Albright***, 437 So.2d 1003, 1005 (Miss. 1983).

¶14. Because of our determination that the custody order was, in fact, temporary, the chancellor was free to make a de novo original award of custody based on the factors in ***Albright***. The chancellor did make such an analysis in awarding custody to Dawn and on every single factor where the chancellor favored one parent over the other, the chancellor concluded that custody with Dawn was favorable.

¶15. If the initial order approving custody with Adam had been determined to be permanent, Dawn would have faced the more difficult burden of demonstrating the need for a modification of the custody order. As a general rule, to modify child custody there must be (1) a material change in circumstances that adversely affects the child and (2) the change of custody is in the best interest of the child. ***Pace v. Owens***, 511 So. 2d 489, 490 (Miss. 1987). However, this Court concluded in ***Riley v. Doerner,*** 677 So.2d 740 (Miss. 1996) that although the chancellor had failed to find a material change in circumstances having an adverse affect on the child, modification was nonetheless justified because it was in the child's best interest.

¶16. This Court in ***Riley*** unanimously rejected an approach that limits the ability of the chancellor to act in the child's best interest.

> The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case. In particular, it should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child's welfare would be best served by such transfer.

*Id.* at 745. This Court noted that this exception to the usual approach should only be applied in unusual circumstances. "In such rare cases, no rigid test or magic words should stand in the way of the chancellor as

he or she acts to improve the child's welfare through a modification of custody." *Id.* Undoubtedly, the custody of Darby Blevins would be just such a rare case where this exception would be warranted. Both parents understood the original agreement was temporary and the chancellor is "clearly convinced" the agreement was temporary. The chancellor's determination that it would be in Darby's best interest for the mother to have custody was actually the first determination by a chancellor on the merits of the question of custody. This determination was made after four days of trial and a careful analysis of the *Albright* factors. This is not the usual situation where the non-custodial parent is seeking the modification. Consequently, this Court could apply the *Riley* exception it has wisely carved out for such unusual cases had the order been permanent.

¶17. The chancellor correctly concluded, based on substantial evidence, that it was in Darby's best interest to be in the custody of Dawn. The chancellor's "polestar consideration" was the child's best interest. Thus, there should be no reversal of the chancellor's finding that Dawn should have custody. Accordingly, the chancellor's decision should be affirmed.

## II. DID THE TRIAL COURT *PROPERLY* APPLY THE *ALBRIGHT* FACTORS TO THE EVIDENCE PRESENTED AT TRIAL?

¶18. This Court has stated that child custody matters are within the chancellor's discretion, and this Court will not reverse absent a finding that the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. *M.C.M.J. v. C.E.J.*, 715 So.2d 774, 776 (Miss. 1998)*; Delozier v. Delozier*, 724 So.2d 984, 986 (Miss. Ct. App. 1998). *Albright v. Albright*, 437 So.2d 1003 (Miss. 1983) clearly states that the primary consideration in all child custody cases is "the best interest and welfare of the child". *Id*. at 1005. *Albright* sets forth a number of factors which should be considered by a chancellor in a child custody case:

> We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of employment; physical and mental health and age of parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.

*Id.*

¶19. Adam claims that the Chancellor erred in the application of the following factors: A) age, B) health of parties, C) future religious example, D) home environment, and E) willingness and ability to provide primary care. Dawn contends that the Chancellor properly considered the *Albright* factors before rendering her decision.

### A) Age

¶20. Adam asserts that the Chancellor erred in concluding that the age of Darby must be considered in

favor of Dawn. Adam refers to a statement in the Chancellor's Memorandum Opinion and Judgment where she wrote:

> [e]ven though the tender years doctrine has been weakened, Darby's being less than two years old must be a factor which strongly favors the mother having custody.

Adam claims that the Chancellor is mistaken and refers to *Smith v. Smith*, 616 So.2d 394, 397 (Miss. 1993), where custody of a two-year-old boy was awarded to the father. Adam asserts that the tender years doctrine, even at its prime, only applied until "[the child] reaches that age and maturity where it can be equally cared for by other persons." *Albright*, 437 So.2d at 1004 (citing *Johns v. Johns*, 57 Miss. 530 (1879)).

¶21. Adam argues that the tender years doctrine is inapplicable in the present matter because Dawn voluntarily relinquished custody of Darby and that this act should prohibit any assumption of special maternal feelings. Adam also feels that it has already been proven that he is capable of caring for Darby as shown by the fact that he had paramount physical custody of Darby while she was under two years of age for the ten months preceding the chancery court hearing.

¶22. Dawn responds by claiming that there are pertinent differences between the *Smith* case, as relied upon by Adam, and the matter at hand. *Smith* dealt with a mother who used the presence of her unborn child as a bargaining chip to coerce her husband into meeting her demands or risk an abortion. *Smith*, 616 So.2d at 395. At the time the trial court granted the father custody, the child in question was twenty-seven months old. *Id*. Dawn also believes that the fact that the *Smith* case involved a male child further distinguishes it from the present case.

¶23. Dawn also counters Adam's assertion that Dawn voluntarily relinquished custody for the purpose of re-enlisting in the military by maintaining that she was pressured by Adam into giving custody to him instead of to her sister, her first preference. Dawn asserts that the trial court recognized the strain that Dawn was under when she made her decision to re-enlist and had to transfer custody to someone else. The Chancellor stated:

> The Court is clearly convinced that the intention of the agreement and order was that the custody was only of a temporary nature, only until Dawn obtained "permanent party" status in the military.

> Dawn counters Adam's declaration that he had custody for the ten months preceding by reminding the Court that the trial court found that Dawn was the primary care giver during Darby's first year.

¶24. The maternal preference in this case may not be warranted in light of the fact that the father had primary care-giver status for the ten months prior to the custody hearing. One can question whether the tender years doctrine has any validity despite the maternal preference rule as referenced in *Albright*, especially in a case such as this one where the child is likely to have a stronger bond with the male parent who has most recently been the primary care giver. *Albright*, 437 So.2d at 1004. What is clear is that this Court in *Albright* felt that abandoning of the tender years doctrine altogether "would discard a factor worthy of weight in determining the best interest of a child in a particular case." *Id.* at 1005.

¶25. Regardless of how the Chancellor viewed the tender years doctrine in making her decision, it is but one factor out of many to be considered in a child custody case. Given the findings below, it cannot be said that the Chancellor's decision is manifestly wrong, clearly erroneous, or the result of the application of an

erroneous legal standard.

## B) Health of Parents

¶26. Adam claims that the Chancellor erred in giving an edge in health to Dawn because Adam smokes and, in addition, that Dawn's medical records were not properly considered when the Chancellor assessed the health of the parents. The records in question are from October, 1996, when Dawn received counseling from a military psychologist. The evaluations of the psychologist included statements that she suffered from an "adjustment disorder with depressed mood" and a provisional "schizoid personality disorder." These evaluations also mentioned the risk of potential suicide and that Dawn might be harmful to others. Dawn admitted at the trial that these records were accurate. Adam argues that the chancellor's conclusion is not a true reflection of the evidence that was presented before the court and that her conclusion was not supported by substantial evidence as required by *__Patout v. Patout__*, 733 So.2d 770 (Miss. 1999).

¶27. Dawn addresses the health of the parents issue by pointing out that the Chancellor actually addressed physical and mental health in two separate subparagraphs, (g and h of the court's opinion). In the first subparagraph, (g), the chancellor states:

> Adam smokes, Dawn does not so the mother has somewhat of an edge in health.

In subparagraph (h) the chancellor stated:

> Much was attempted to be made of Dawn's medical records. The Court agrees with the testimony of the recruiting officer, there was nothing negative in her file. This is also proven by the fact that the Air Force took her back. If anything, the Court would hold Adam's failure to sign his medical waiver against him. His attorney's explanation that they hadn't presented them with one is unconvincing. This issue of medical waivers was fully discussed with the Court, when Dawn delivered hers, Adam certainly had the opportunity to deliver a signed waiver.

¶28. Dawn believes that the chancellor properly reviewed the medical records in question when coming to her decision regarding Dawn's mental health. Dawn relies on statements made by the Chancellor that show the records were properly considered. After Dawn's counsel objected to their admission into evidence, the chancellor stated,

> Yeah. You know, Mr. Pisarich, I am going to look at these medical records knowing that they obtain hearsay, knowing that she has said under oath that she has never committed suicide, never attempted to commit suicide. That her diagnosis was stress-related to an adjustment for military. She has testified that she has absolutely no mental health problems now and I know what her testimony has been and I've noted all the objections for the record.

The Chancellor further states:

> And again, once again, Mr. Pisarich, the reason I am letting the medical records in is I think the *Albright*, one of the factors in *Albright* is mental health. And I feel like I need to look at the record to make an informed decision.

¶29. Dawn contends that the Chancellor was free to give these medical records whatever weight she deemed proper and points out that the medical records being reviewed predated Darby's birth by almost a

year. She also argues that if these medical records were so damaging then the Air Force would not have allowed her to reenlist. Testimony of Dawn's air force recruiter confirms that the records that he is required to review when she explored reenlisting did not contain any negative or derogatory information. Testimony does not clearly indicate whether the medical records in question were part of what the Air Force recruiter considered in Dawn's allowance to reenlist, but the recruiter did state that the military records he reviewed would contain any information that the Air Force considered "negative or derogatory."

¶30. Dawn maintains that Adam cannot now complain as to any lack of specific findings of fact and conclusion of law because Adam's trial counsel did not make a specific request asking for such. Dawn refers to M.R.C.P. 52(a) and Rule 4.01 of the Uniform Chancery Court Rules which are as follows:

> Rule 52 Findings by the Court; (a): Effect. In all actions tried upon the facts without a jury the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specially and state separately in its conclusions of law thereon and judgment shall be entered accordingly.

M.R.C.P. 52(a).

> Rule 4.01 of the Uniform Chancery Court Rules titled "Findings by the Court": In all actions where it is required or requested, pursuant to M.R.C.P. 52, the Chancellor shall find the facts specially and state separately his conclusions of law thereon. The request must be made either in writing, filed among the papers in the action, or dictated to the Court Reporter for record and called to the attention of the Chancellor.

U.C.C.R. 4.01. Dawn believes that because Adam failed to request specific findings of fact and conclusions of law, contrary to what occurred in *Patout* where such a request was made, that the matter should be considered waived. *Patout*, 733 So.2d at 772-73.

¶31. The record clearly indicates that the Chancellor properly considered the mental and physical health of both parents and that her decision was based on the factors as outlined in *Albright*. Because of this, and the fact that Adam failed to request specific findings of fact and conclusions of law, this Court is hard pressed to find that the Chancellor's decision is manifestly wrong, clearly erroneous, or the result of the application of an erroneous legal standard. This Court has stated that child custody matters are solely within the Chancellor's discretion and we find that there was no abuse of this discretion in the Chancellor's determination of the health of the parents.

### C) Future Religious Example

¶32. Adam challenges statements made in the Chancellor's Memorandum Opinion about future religious example. The Chancellor commented:

> The Court slightly favors Dawn when considering Darby's future religious example. Although Adam does at times pray with Darby and has attended a non-denominational 'house of prayer', Dawn seems much more committed and consistent in her Catholic upbringing.

Adam complains that there is no evidence to support the conclusion of Dawn being committed to Catholicism. Adam relies on part of the record where it is shown that Dawn never took Darby to church while she lived in Mississippi and that Dawn never attended church while in Mississippi. Adam also refers to

Dawn's committing adultery while being married as against the beliefs of Catholicism.

¶33. Dawn believes that the Chancellor's determination regarding future religious example was properly made in her favor. Dawn refers to Adam's testimony where he stated that he was a Roman Catholic but did not attend church. Adam also stated that he did not remember the last time he was inside a church and that he had never taken Darby. Adam did state that he and Darby had prayed together in a non-denominational house of prayer once or twice. Adam also testified that he thought religion was important and that if he received custody he would send her to a private Catholic school.

¶34. "Future religious example" is not a factor listed in *Albright*, although it could theoretically fall within "other factors relevant to the parent-child relationship" or under "moral fitness of the parents" as found in *Albright*. *Albright*, 437 So.2d at 1005. This Court, in *McLemore v. McLemore*, 762 So.2d 316, 320 (Miss. 2000), stated "[b]oth the mother and father should be vitally interested in seeing that their children get regular and systematic spiritual training. Whether it be by attending Sunday School each Sunday or Church or both is for the parents alone to decide." The Chancellor did not abuse her discretion when considering future religious example in the custody determination of Darby.

### D) Home Environment

¶35. Adam argues that the Chancellor incorrectly focused on Adam's infirm father in making her determination regarding home environment and ignored many of the surrounding facts and circumstances that could have resulted in a different conclusion. Adam offers that a comparison of both homes reveals that Adam's was favorable over Dawn's at the time of the hearing. Adam was living in a house located on seven acres in Kentucky while Dawn was in a one bedroom apartment. Adam's mother, aunt, grandmother and grandfather were all within twenty minutes of him while Dawn's parents were three hours from her.

¶36. Adam's father is an HIV positive hemophiliac and suffers from cancer. Adam's father also smokes three to four packs of cigarettes a day. The Chancellor considered these factors and stated the following:

> The Court would like to make it perfectly clear that it is not penalizing Adam because he moved to take care of his critically ill father, it is commendable. Nor is the Court reacting to an irrational fear or prejudice of persons who are HIV positive. The Court does however, question if the home of a critically ill patient, regardless of the illness, is the best environment in which to raise a toddler. It also is not assuring to hear that the paternal grandfather smokes three to four packs of cigarettes a day, even if it is true he does not smoke when Darby is home. The atmosphere of the home would still have to be tainted with smoke. The Court finds the stability of the home environment should favor Dawn.

¶37. This Court does not see that the Chancellor abused her discretion in considering home environment in order to determine who received custody of Darby. It also cannot be said that the Chancellor's decision regarding home environment is manifestly wrong, clearly erroneous, or the result of the application of an erroneous legal standard.

### E) Ability and Willingness to Provide Care

¶38. Adam contests the Chancellor's ruling that Dawn has better parenting skills. Adam claims that the Chancellor's finding was erroneous because it was based on one isolated incident that occurred prior to his custody of Darby. The Chancellor stated:

Each party has exhibited good parenting skills, and each are willing to provide primary care. The Court has weighed this factor in favor of Dawn based on the evidence of Adam's having, while the parties were still living together, left the baby in the crib until noon, unfed and unchanged; and his now leaving the child one or two times a month alone with his invalid father. Even though Adam's mother testified her ex-husband had only limited use of his arms and hands, Adam stated, "she is alright, she never wakes up." The Court is clearly convinced Dawn has better parenting skills.

Adam refers to *Tucker v. Tucker*, 453 So.2d 1294, 1297 (Miss. 1984), where this Court stated "the 'totality of the circumstances' must be considered...an isolated incident....does not in and of itself justify a change in custody."

¶39. While it is clear that the Chancellor gave weight to the incident where Adam left Darby unattended until noon, it cannot be said that the Chancellor's ruling was based solely on this one incident. This Court does not see that the Chancellor abused her discretion in her consideration of ability and willingness to provide care in order to determine who received custody of Darby. It also cannot be said that the Chancellor's decision regarding ability and willingness to provide care is manifestly wrong, clearly erroneous, or the result of the application of an erroneous legal standard.

### III. DID THE TRIAL COURT USE CUSTODY DETERMINATION TO PENALIZE ADAM BLEVINS, AND IF SO APPLIED, WAS IT MANIFESTLY ERRONEOUS?

¶40. Adam purports that he was wrongfully penalized by the Chancellor when she ruled against him in her custody determination of Darby for: A) not having a medical waiver signed; and for B) visitation problems. Adam correctly states that the only purpose of a custody determination is to advance the best interest of the child. *Albright*, 437 So.2d at 1005. Adam is also correct in asserting that a custody determination should not have the purpose of "punishing" an offending party unless the offense directly threatens the best interest of the child. *Crowson v. Moseley*, 480 So.2d 1150, 1152 (Miss. 1985). Analysis of the medical waiver and visitation issues follow.

### A) The Medical Waiver Issue

¶41. The record does not clearly indicate why a medical waiver was never executed by Adam. Apparently there was disagreement or misunderstanding between counsel for both parties as to who was to provide the form to be signed. What is clear is that a medical waiver was executed by Dawn and some of her medical records were admitted into evidence. No medical records were introduced into evidence against Adam because he never executed a medical waiver. When discussing the health of the parties the Chancellor stated:

> If anything, the Court would hold Adam's failure to sign his medical waiver against him. His attorney's explanation that they hadn't presented them with one is unconvincing. The issue of medical waivers was fully discussed with the Court, when Dawn delivered hers, Adam certainly had the opportunity to deliver a signed waiver.

¶42. Adam claims that the Chancellor's holding Adam's failure to sign his medical waiver against him constitutes a serious misapplication of the broad powers granted to a Chancellor. Adam refers to *Belding v. Belding*, 736 So.2d 425 (Miss. Ct. App. 1999), where the Mississippi Court of Appeals addressed the issue of a chancellor that ordered psychological examinations be conducted on both parents and their child

in a child custody proceeding. The Court of Appeals ruled that, at least in Mississippi, there is no authority "for a Chancellor to order disputant spouses to undergo either a mental or physical examination." *Id*. at 431. The Court of Appeals also referred to Mississippi Rule of Evidence 503 which states:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing (A) knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient, or (B) confidential communications made for the purpose of diagnosis or treatment of his physical, alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

M.R.E. 503(b). The Court of Appeals then stated that "[t]he Supreme Court has acknowledged that 'an increasing number of jurisdictions have, either by judicial decision or statute, created exceptions to the physician psychotherapist-patient privilege in child abuse and neglect cases, custody and termination of parental rights proceedings when the mental health of the parent could impact the welfare of the child.'" *Id*. (quoting *Lauderdale County Dep't of Human Servs. v. T.H.G.*, 614 So.2d 377, 383 (Miss. 1992)). "However the Court refused to create an exception to Rule 503, reasoning that '[s]hould the legislature determine that the privilege should be waived in termination of parental rights cases, it is their prerogative to make the necessary statutory changes.'" *Id*.

¶43. Although not clear from the record, it appears that both parties agreed at some point to execute medical waivers so that each party could have access to the other's medical records. This would explain the Chancellor's reaction and comments to Adam's counsel during the trial. Evidently the Chancellor had concluded that both sides had agreed to provide each other medical waivers. This would present a fact situation very different from the facts in *Belding*. Here we have a Chancellor attempting to hold a party to an agreement it made with counsel opposite. Dawn had executed a medical waiver and was waiting on Adam to provide one, which he ultimately refused to do. This gave Adam a clear advantage because the Chancellor would be able to view Dawn's medical records that were obtained upon an agreement between the parties, but the Chancellor would not see Adam's. Also different from *Belding*, at no time was there any order or attempted order by the Chancellor to force either party to submit to a medical examination.

¶44. Dawn contends that even if this Court determines that the Chancellor's actions constituted an order by the trial court to waive medical privilege, that the medical records being sought were "past" and would fall under Mississippi Rule of Evidence 503(f). Rule 503(f) states,

> Any party to an action or proceeding subject to these rules who by his or her pleadings places in issue any aspect of his or her physical, mental or emotional condition thereby and to the extent only waives the privilege otherwise recognized by this rule. This exception does not authorize ex parte contact by the opposing party.

¶45. Dawn also represents that a party who refuses to waive the medical privilege may face an adverse unfavorable inference. *Ward v. Foster*, 517 So.2d 513 (Miss. 1987); *Jackson v. Brumfield*, 458 So.2d 736 (Miss. 1984). This unfavorable inference has been applied to family law matters in other jurisdictions. *Brodsky v. Brodsky*, 233 S.W.2d 829 (Mo. 1950).

¶46. In his reply brief Adam contends that Dawn is asking this Court to adopt a new rule that would penalize a party in a custody case for failing to waive his or her physician-patient privilege. This is simply not

the case. This Court would be incorrect to punish a party for failing to waive his or her medical privilege. Failure to waive is certainly within a party's right. What Adam is being penalized for by the Chancellor is for making an agreement with the other party to have both waive their privilege; getting the sought after medical records from the other side; and subsequently deciding to not waive the medical privilege, leaving the other party at a disadvantage. Such conduct by a party should not be condoned or ignored by a Chancellor.

## B) The Visitation Issue

¶47. When discussing her findings of fact and conclusions of law, the Chancellor stated:

> The Court notes with displeasure that while Darby has remained in the father's custody pending the outcome here, until trial Adam has been anything but cooperative in allowing visitation and promoting a close relationship with the child's mother. Visitation has at times only been implemented by resort to this Court. Most disturbing, on one occasion Dawn called to request her ordered visitation be moved up two days. Although Adam informed her Darby wasn't feeling well and he wasn't sure he wanted her to have visitation, he didn't actually refuse and allowed her to come to Biloxi thinking she would pick up Darby for visitation. Dawn came to Biloxi from Texas to pick up Darby only to be informed that Adam and Darby was [sic] moving on that day to Kentucky and Dawn was forced to follow him to Kentucky to pick up Darby.

Adam claims that the record is devoid of any evidence suggesting that he ever wilfully denied Dawn her rights of visitation with Darby. Adam also maintains that no motion for contempt was brought in reaction to the incident; visitation did occur; and that the Chancellor did not have a pleading before her with respect to the incident at the time of her decision regarding custody of Darby.

¶48. Adam refers to *Ortega v. Lovell*, 725 So.2d 199 (Miss. 1998), where this Court addressed the issue of visitation troubles pending a final custody determination. This Court held that a finding of willful contempt based upon a failure to grant court ordered visitation did not constitute grounds for changing custody absent some showing of material or substantial change in circumstances adversely affecting the child's welfare. *Id*. at 204.

¶49. Adam also cites *Ash v. Ash*, 622 So.2d 1264 (Miss. 1993), where this Court held that a mother's continual refusal to allow a father visitation did not constitute a material change of circumstances justifying a change in custody. *Id.* at 1266. The Court stated "[t]he better rule would be for a chancellor to enforce contempt orders through incarceration, when necessary, to insure compliance with custody provisions rather than resorting to a change of custody." *Id*.

¶50. Adam concludes by quoting *Crowson v. Moseley*, 480 So.2d 1150 (Miss. 1985), where this Court stated:

> The present general rule prevailing in jurisdictions throughout this country is that a custody determination is not to punish an offending spouse. The wrongful conduct of a spouse is not a proper consideration unless it bears upon fitness to have the control and custody of the child. And, even if it does have some bearing upon fitness, it should not be carried to any further degree than it is necessary for the child's own interest.

*Id.* at 1152. Adam feels that the Chancellor's statement regarding the visitation problems between Dawn and Adam and the above cited case law support the notion that he was prejudiced when the Chancellor

made her custody determination.

¶51. Dawn rebuts Adam's claim that the record is devoid of evidence as untrue. Dawn claims that the record indicates "several instances" where Adam denied Dawn the opportunity to see or speak with Darby pending the trial court's final decision. Dawn refers to a time when Adam would not answer his door to allow her in to get her belongings as another example of Adam denying Dawn a visit with Darby. It appears from the record that this was part of a couple's squabble and had little to do with Dawn attempting to see Darby.

¶52. Adam's reliance on *Ortega* and *Ash* is misplaced. Both cases dealt with possible changes in custody after permanent custody had been determined. In this case permanent custody of Darby was never clearly established. The custody agreement that was made prior to this hearing was made out of necessity so that Dawn could reenlist in the Air Force. The goal of the parties at the time of the agreement's creation was for Dawn to complete her training in the Air Force and then she and Adam would marry, forming a family with their daughter Darby. Ultimately, Dawn and Adam did not marry, resulting in the need for the hearing below to determine custody. Both parties subsequently stipulated that the custody agreement made before Dawn's reentry into the Air Force was temporary in nature, therefore *Ortega* and *Ash* do not apply to the case at hand. No material change in circumstances need be shown when permanent custody has not yet been established. The Chancellor was within her powers when she made her custody determination in this case.

### IV. WAS THE TRIAL COURT'S DECISION REGARDING CUSTODY SUPPORTED BY SUBSTANTIAL EVIDENCE?

¶53. Adam listed a third issue under his statement of issues but failed to address it in his initial brief. As this Court stated in *Smith v. Dorsey*, 599 So.2d 529, 532 (Miss. 1992), "the failure to cite any authority can be treated as a procedural bar, and this Court is under no obligation to consider the assignments." (citing *R.C. Petroleum, Inc. v. Hernandez*, 555 So.2d 1017, 1023 (Miss.1990); *Brown v. State*, 534 So.2d 1019, 1023 (Miss.1988); *Shive v. State*, 507 So.2d 898 (Miss.1987); *Read v. S. Pine Elec. Power Ass'n*, 515 So.2d 916 (Miss. 1987); *Devereaux v. Devereaux*, 493 So.2d 1310 (Miss. 1986); *Pate v. State*, 419 So.2d 1324 (Miss. 1982)). Not only does Adam fail to cite any authority to support this issue, but he also declines to devote any discussion or attention whatsoever to this issue. Adam did address this issue in his reply brief after Dawn had submitted her response brief asserting that this issue was now procedurally barred. It would not be fair for us to review this issue as written in the reply brief because Dawn was not afforded the opportunity to respond. Therefore, this Court is unable to assess this issue on the merits and treats it as procedurally barred.

### CONCLUSION

¶54. Based on the foregoing analysis, we affirm the judgment of the Harrison County Chancery Court.

¶55. **AFFIRMED.**

**SMITH, MILLS, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR. BANKS, P.J., CONCURS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J. EASLEY, J., JOINS IN PART.**

**BANKS, PRESIDING JUSTICE, CONCURRING IN PART:**

¶56. I concur in the result reached by the majority. I adhere, however, to the views expressed in my dissenting opinion in *McLemore v. McLemore*, 762 So. 2d 316, 323 (Miss. 2000) (Banks, P.J., dissenting). Here, I agree with the majority's observation that "future religious example" is not an *Albright* factor. *See **Albright v. Albright,*** 437 So. 2d 1003, 1005 (Miss. 1983). In my view, however, the chancellor abused her discretion in considering it as such. Because I conclude that this factor was not given decisive weight, I, nevertheless, concur in affirming the chancellor's ultimate decision.

**McRAE, P.J., JOINS THIS OPINION. EASLEY, J., JOINS IN PART.**

1. It is often said that no child custody order is permanent. Technically, this is correct because custody is always subject to modification in the best interest of the child. The terms "permanent" and "temporary" are used here because they are the terms chosen by the chancellor to distinguish between the chancery court award of custody arising out of the custody arrangement which Adam and Dawn temporarily entered into for the sole purpose of enabling Dawn to reenlist in the Air Force and a regular chancery court award of custody that is intended to continue indefinitely, until modified by order of the court.