ROBERTS, J.,
for the Court:
¶ 1. The Itawamba County Chancery Court granted Tania Willard’s motion to modify custody of her son, Tyler Lindsey. Tyler’s father, Jason Lindsey, claims the chancellor erred when she found a material change in circumstances adverse to Tyler’s best interests. Additionally, Jason claims that the investigatory guardian ad litem failed to properly conduct her investigation. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Jason and Tania were divorced in December 2004. They agreed that they would share joint legal and physical custody of their eight-year-old son, Tyler. However, there was no set visitation or custody schedule. Jason was ordered to pay Tania $25 per week in child support.
¶ 3. The next year, both Jason and Tania moved for primary custody of Tyler. The chancellor did not modify the joint legal and physical custody arrangement, but Jason received physical custody of Tyler during the school year. Tania received custody of Tyler during the summer months. Additionally, neither party was obligated to pay child support.
¶ 4. In April 2010, Tania again moved to modify custody of Tyler. Jason responded with a counterclaim for contempt regarding unpaid medical bills. Jason also moved to modify the visitation schedule.
¶ 5. The parties went before the chancellor in December 2010. During that hearing, the chancellor heard testimony that Jason planned to divorce his new wife, Mandy Galloway Lindsey, who had moved out of Jason’s home. According to multiple witnesses, Mandy was the cause of great instability with Jason. There were allegations that Mandy was having another man’s[1] baby, that she had numerous para *1263 mours, and that Jason would pay Mandy’s bills while his own bills went unpaid. However, Tyler never testified negatively about Mandy.
¶ 6. There was also testimony that Tyler, who was thirteen years old at the time, spent extended periods of time alone because of Jason’s work schedule.[2] Kathleen Hoffman, who worked in the lunchroom at Tyler’s school, testified that Tyler often did not have money for lunch. Tyler testified that he preferred to remain with Jason. After the December 2010 hearing, the chancellor entered an interim order. The chancellor declined to modify custody at that time, but the chancellor reserved the right to revisit the allegations after a hearing at a later date.
¶ 7. The parties reconvened for the second hearing in May 2011. At that hearing, the chancellor heard testimony that Tyler was no longer allowed to spend time with his grandfather, Jimmy, because of a disagreement between Jason and Jimmy.[3] Furthermore, Jason and Mandy were considering rekindling their relationship. Rather than leaving Tyler with Jimmy, Jason often left Tyler with Mandy, or Tyler spent the night with friends. After the May 2011 hearing, the chancellor appointed a guardian ad litem to act in an investigatory capacity. The guardian ad litem later recommended that the chancellor modify custody of Tyler so that Tania had physical custody of him during the school year and Jason had physical custody during the summer. During the final hearing, Jason’s attorney vigorously cross-examined the guardian ad litem. Jason and Mandy also testified in an attempt to clarify or dispute the guardian ad litem’s recommendations and findings. Again, Tyler reaffirmed that he preferred to live with Jason. Additional facts will be discussed in the analysis, as necessary.
¶ 8. Ultimately, the chancellor found that there had been a material change in circumstances adverse to Tyler’s best interests and awarded Tania custody of Tyler during the school year. Additionally, Jason received custody of Tyler during the summer. Jason appeals and claims the chancellor erred when she found that there had been a material change in circumstances adverse to Tyler’s best interests. Jason also claims the guardian ad litem failed to adequately conduct her investigation.
STANDARD OF REVIEW
¶ 9. In domestic-relations cases, our standard of review is limited. In re *1264 Dissolution of Marriage of Wood, 35 So.3d 507, 512 (¶ 8) (Miss.2010). The findings of the chancellor “will not be disturbed unless [they are] manifestly wrong or clearly erroneous.” Lowrey v. Lowrey, 25 So.3d 274, 285 (¶ 26) (Miss.2009) (quoting Sanderson v. Sanderson, 824 So.2d 623, 625 (¶ 8) (Miss.2002)). “Under the standard ... utilized to review a [chancellor’s findings of fact, particularly in the areas of divorce, alimony and child support, [the appellate court] will not overturn the [chancellor’s decision] on appeal unless [her] findings were manifestly wrong.” Wood, 35 So.3d at 512 (¶ 8) (quoting Duncan v. Duncan, 774 So.2d 418, 419 (¶ 4) (Miss.2000)).
ANALYSIS
I. MATERIAL CHANGE IN CIRCUMSTANCES
¶ 10. Jason claims the chancellor erred when she held that Tania satisfied the burden of proof necessary to modify custody of Tyler. In her opinion and final judgment, the chancellor stated:
Tyler has continued to be fully responsible for preparing himself for school, usually being left alone by [Jason] for periods in excess of an hour prior to school. Tyler also continues to routinely spend approximately four hours alone after school prior to [Jason]’s return home from work when he is working the day shift. When [Jason] is working the night shift, Tyler is left in the care of [Jason]’s ex-wife, Mandy Galloway, who has an unstable relationship with [Jason], including having paramours at [Ja-sónos residence while Tyler is present. Taking into account the totality of the circumstances, including the continuing increasing instability in [Jason]’s residence and the child’s testimony regarding the conditions which have grown worse during the course of this litigation, the Court finds [Tania] has satisfactorily demonstrated a material and substantial change in circumstances that adversely affects the child.
¶ 11. To successfully move to modify custody of a child, a noncustodial parent must prove “(1) a material change in circumstances has occurred since the issuance of the judgment or decree sought to be modified, (2) the change adversely affects the welfare of the child, and (3) the proposed change in custody would be in the best interest of the child.” Cantin v. Cantin, 78 So.3d 943, 948 (¶ 15) (Miss.Ct.App.2012) (citation omitted). “The chancellor must consider the totality of the circumstances to determine whether there was a material change in circumstances.” Id. (citation and quotation omitted).
¶ 12. In appeals from child-custody decisions, our polestar consideration, like the chancellor’s, must be the best interest of the child. Montgomery v. Montgomery, 20 So.3d 39, 42 (¶ 9) (Miss.Ct.App. 2009) (quoting Hensarling v. Hensarling, 824 So.2d 583, 587 (¶ 8) (Miss.2002)). “So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor’s decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor.” Hammers v. Hammers, 890 So.2d 944, 950 (¶ 14) (Miss.Ct.App.2004) (quoting Bower v. Bower, 758 So.2d 405, 412 (¶ 33) (Miss.2000)). “The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each.” Barnett v. Oathout, 883 So.2d 563, 566 (¶ 6) (Miss.2004).
¶ 13. Jason’s argument is predicated in part on the fact that the chancellor did not find that there had been a material change in circumstances adverse to Tyler’s best interests after the first hearing during December 2010. Jason reasons that because *1265 the chancellor had declined to find a change in circumstances based on the evidence presented during the December 2010 hearing, the chancellor could not have reasonably found that a change was warranted after the July 2011 hearing.
¶ 14. Jason misinterprets the interim order that the chancellor issued after the December 2010 hearing. Although the chancellor stated that Tania had not demonstrated a material change in circumstances adverse to Tyler’s best interests, the chancellor also stated that “this matter shall be set for review to determine the status of the situation at that time.” The chancellor also issued a supplemental opinion after her interim order. In her supplemental opinion, the chancellor stated: “[0]ut of an abundance of caution ... this cause shall be reviewed at the conclusion of the school year ... with neither party being prejudiced by the Court’s present decision.” We interpret the chancellor’s interim order and supplemental opinion as a temporary decision reserving the right to review the matter de novo during a subsequent hearing. A chancellor has the discretion to make temporary findings with the intent to conduct a de novo review of the question at a later date. See Blevins v. Bardwell, 784 So.2d 166, 170-71 (¶ 14) (Miss.2001).
¶ 15. A chancellor is not required to wait for proof that a custodial parent’s actions have adversely affected a child. Ruth v. Burchfield, 28 So.3d 600, 606-07 (¶ 20) (Miss.Ct.App.2009). “[WJhere a child living in a custodial environment clearly adverse to the child’s best interest[ ] somehow appears to remain unscarred by his or her surroundings, the chancellor is not precluded from removing the child for placement in a healthier environment.” Riley v. Doerner, 677 So.2d 740, 744 (Miss. 1996). In Ruth, this Court affirmed a chancellor’s decision to deny a noncustodial parent’s motion to modify child custody because the custodial parent had “removed the conditions that could have arguably had an adverse effect on [the child] had they been allowed to continue.” Ruth, 28 So.3d at 607 (¶ 20). But in this case, Jason reintroduced the condition that arguably had an adverse effect on Tyler. During the December 2010 hearing, Jason testified that he and Mandy were getting a divorce. Jason and Mandy were divorced during the May 2011 hearing. But as of the July 2011 hearing, Jason and Mandy had resumed cohabitation. During that hearing, Jason and Mandy both testified that they intended to remarry.
¶ 16. The chancellor heard testimony that Jason and Mandy had an unstable relationship. Jason’s father, Jimmy, testified that Mandy had been cheating on Jason. Jimmy also testified that it was not suitable for Tyler to live in Jason’s home at the same time that Mandy lived there. As of the December 2010 hearing, Mandy was pregnant. According to Mandy’s former mother-in-law, Kathy Spann, Mandy told her that Jason was not the father of Mandy’s child. Tyler testified that Jason and Mandy had split up and gotten back together two or three times.
¶ 17. Jimmy told the guardian ad litem that after Jason and Mandy divorced, Jimmy “had to go console Jason because Jason was drunk and [he] threatened to kill himself.” There was testimony that Mandy believed the father of her child was a man who was in prison as of the time of the hearings. Mandy later claimed that Jason was the father of her child, and she had only befriended the man who was allegedly the father of her child. There was also testimony that Jason and Mandy allowed one of Mandy’s female friends to live with them and Tyler for an extended period. Tyler was aware that Mandy’s female friend had sex with two minors in *1266 Jason and Tyler’s home. Additionally, there was testimony that Tyler hid in a closet during a physical altercation between Jason and Mandy. During that altercation, Tyler heard Mandy tell Jason that she “didn’t care about his son.” During a different physical altercation, Mandy bit Jason’s nose. Based on the totality of the circumstances, it was within the chancellor’s discretion, to find that there had been a material change in circumstances adverse to Tyler’s best interests.
II. PERFORMANCE OF THE GUARDIAN AD LITEM
¶ 18. Jason has a litany of complaints regarding the way the guardian ad litem conducted her investigation. According to Jason, the guardian ad litem was derelict in her duties, and she “abandoned her obligation” to conduct a proper investigation. Jason claims the guardian ad litem improperly obtained information from third parties, rather than going to more appropriate sources. For example, Jason complains that the guardian ad litem asked Jason’s father, Jimmy, whether Jason paid Mandy’s bills while Jason’s own bills went unpaid, but the guardian ad litem never asked Jason whether that was true. Additionally, Jason laments that the guardian ad litem accepted Jimmy and Tania’s word regarding the paternity of Mandy’s baby, but the guardian ad litem never asked Mandy whether her baby was fathered by someone other than Jason. Jason raises several other similar allegations.
¶ 19. The guardian ad litem was appointed in an investigatory capacity. She was not appointed to represent Tyler. Thus, the guardian ad litem was “obligated to investigate the allegations before the court, process the information found, report all material information to the court, and (if requested) make a recommendation.” S.G. v. D.C., 13 So.3d 269, 282 (¶ 57) (Miss.2009). Prior to making a recommendation, the guardian ad litem must “provid[e] the court with all material information [that] weighs on the issue to be decided by the court, including information which does not support the recommendation.” Id.
¶ 20. The chancellor contacted the guardian ad litem on June 14, 2011. The guardian ad litem began her investigation soon afterwards. She interviewed fourteen people and “evaluated all documents filed in this matter and all [of the] correspondence [that was] given to her.” On July 19, 2011, the guardian ad litem filed her report. Based on the totality of the circumstances, the guardian ad litem recommended that the chancellor find that there had been a material change in circumstances adverse to Tyler’s best interests. The guardian ad litem then recommended that Tania have physical custody of Tyler during the school year, and that Jason have physical custody of Tyler during the summer.
¶ 21. Jason’s attorney vigorously cross-examined the guardian ad litem during the July 2011 hearing. At that time, the guardian ad litem had seventeen years’ experience as a guardian ad litem for the Itawamba County Youth Court. She had also worked for the Itawamba County Department of Human Sendees. The guardian ad litem explained that she asked Jason’s father, Jimmy, several questions without verifying Jimmy’s responses with Jason because she did not want to further harm Jimmy’s relationship with Jason. The chancellor heard the guardian ad li-tem’s explanations regarding the manner in which she conducted her investigation. Jason and Mandy also testified during the July 2011 hearing, as did Tyler. Consequently, the chancellor heard what Jason and Mandy would have said in response to *1267 the questions Jason’s attorney thought the guardian ad litem should have asked. Finally, the chancellor did not “rubber stamp” the guardian ad litem’s report. Although the chancellor reached the same conclusions as the guardian ad litem, the chancellor did so based on her own analysis. We find no merit to Jason’s claim that the guardian ad litem’s investigation somehow resulted in reversible error. It follows that we find no merit to this issue.
¶ 22. THE JUDGMENT OF THE ITAWAMBA COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., NOT PARTICIPATING.

. There was testimony that the father of Mandy’s baby was possibly someone who was in prison for possession and manufacturing of crystal methamphetamine. Mandy later testified that she had only befriended that man after she separated from Jason. Mandy also *1263 testified that she somehow arranged for that man to be a trusty while he was in prison. No definitive paternity test was ever introduced into evidence. It remains unclear whether Jason is actually the father of Mandy's baby, although Jason testified that he intended to raise the baby as his own child.

. Jason's work schedule required that he work twelve-hour shifts. He was required to work four days followed by four days off. Additionally, he alternated between the day shift and the night shift. Because Jason had to drive approximately an hour to get to work, a typical day shift required that he leave his home at 5:30 a.m. He would then return home sometime between 7:00 and 8:00 p.m. When he worked nights, he would leave at 5:30 p.m. and return home sometime between 7:00 and 8:00 a.m. During the December 2010 hearing, Jason testified that Tyler often spent the night with Jason’s father, Jimmy Lindsey, when Jason had to work nights. Tyler typically got up alone and stayed home alone after school when Jason worked the day shift.

. The source of that disagreement appears to have been based partially on Jimmy's testimony during the December 2010 hearing and an argument between Jason and his stepmother. According to Tyler, Jimmy's wife had told Jason to leave Jimmy's property sometime after the December 2010 hearing.